1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

James S. Rogers, WSBA No. 5335
LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle, WA 98101
Phone: (206) 621-8525
Facsimile: (206) 223-8224
Email: jsr@jsrogerslaw.com
Attorneys for Plaintiff

Clyde Talbot Turner, Arkansas Bar No. 85158
TURNER & ASSOCIATES, P.A.
4705 Somers Ave. S-100
North Little Rock, AR 72116
Phone: (501) 791-2277
Facsimile: (501) 791-1251
Email: tab@tturner.com
*Pro Hac Vice Application Pending*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
### AT RICHLAND

| | |
|---|---|
| CHEP R. GAUNTT,<br><br>      Plaintiff,<br><br>      vs.<br><br>SYNGENTA SEEDS, INC., a Delaware corporation; SYNGENTA AG, a foreign company; SYNGENTA CROP PROTECTION AG, a foreign company; SYNGENTA CORPORATION, a Delaware corporation; SYNGENTA CROP PROTECTION, LLC, a Delaware corporation; and SYNGENTA BIOTECHNOLOGY, INC., a Delaware corporation,<br><br>      Defendants. | NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**AND JURY DEMAND** |

CLASS ACTION COMPLAINT – 1

Plaintiff, Chep R. Gauntt, brings this action individually and on behalf of all others similarly situated against Syngenta Seeds, Inc. ("Syngenta Seeds"), Syngenta AG ("Syngenta AG"), Syngenta Crop Protection AG ("Crop Protection AG"), Syngenta Corporation ("Syngenta Corp"), Syngenta Crop Protection, LLC ("Crop Protection LLC"), and Syngenta Biotechnology, Inc. ("Syngenta Biotech") (Syngenta AG, Crop Protection AG, Syngenta Corp, Crop Protection LLC, and Syngenta Biotech are sometimes hereinafter collectively referred to as either "Defendants" or "Syngenta") and state as follows:

## INTRODUCTION

Plaintiff, Chep R. Gauntt brings his claims individually and on behalf a proposed class of persons and entities harmed by Syngenta's conduct ("Washington class"). Syngenta is a multibillion-dollar global agribusiness enterprise that develops and sells genetically modified corn seeds. Plaintiff and Syngenta are part of an interconnected industry and market that demands and expects all market participants to act, at least in part, for the mutual benefit of all others in their web.

Biotechnology sits at the heart of this industry. It holds great promise but can also cause great harm. Biotechnology companies such as Syngenta must act responsibly when commercializing new products containing genetically modified traits. All industry participants, including Syngenta, understand that irresponsible

CLASS ACTION COMPLAINT – 2

commercialization of a new genetically modified product can cause major trade disruption and massive harm to stakeholders, including Plaintiff and the Washington class. That is why industry leaders, including Syngenta, have pledged to all other stakeholders that they will act responsibly in introducing new genetically modified traits.

Syngenta broke that pledge. Starting in 2010, Syngenta took unreasonable and irresponsible actions to launch two new products containing genetically modified traits before obtaining approval from China, a key export market. These actions caused the Chinese market to effectively close to U.S. corn shipments.

After a period of development, Syngenta petitioned the United States Department of Agriculture ("USDA") in 2007 for deregulation of its Agrisure Viptera branded corn seed, which contains the genetically modified MIR162 trait. The USDA approved Viptera for sale in 2010. Syngenta recognized that China had not approved MIR162. Syngenta further knew that China's approval was important, as a large and growing export market. In fact, Syngenta had recently sought regulatory approval in China, which on average takes two to three years. Syngenta was warned by industry participants not to introduce the MIR162 genetic trait without key export market approval because of the devastating consequences that were likely to occur from premature commercialization. But Syngenta had a limited

CLASS ACTION COMPLAINT – 3

patent life for this genetic trait. Every year that passed without commercialization resulted in lost monopoly profits for Syngenta.

Syngenta had a choice. It could gamble, or it could wait. Syngenta decided to gamble and immediately brought Viptera to market. Syngenta knew that China would not approve MIR162 until sometime after that trait had entered export channels, which, in turn, created a huge risk that the U.S. corn industry could lose one of its large and growing export markets. Worse, Syngenta repeatedly submitted incomplete regulatory petitions in China, thereby delaying the regulatory approval process. Syngenta knew that farmers, including Plaintiff and the Washington class were likely to be adversely impacted by a sudden loss of China as a market for U.S. corn.

From 2011 through 2013, Syngenta was asked by industry participants to stop its aggressive commercialization of Viptera. China's importance as a purchaser of U.S. corn was growing rapidly, and China still had not approved MIR162. Syngenta ignored these pleas. It expanded sales for the 2012 and 2013 growing seasons. By then, Viptera corn had contaminated the general domestic corn supply.

In 2013, Syngenta's gamble went bust. China did exactly what everyone in the industry, including Syngenta, knew would happen if China found U.S. shipments contaminated with MIR162: China began rejecting entire shipments of corn from

CLASS ACTION COMPLAINT – 4

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525 Fax: 206/223-8224

the United States. Industry participants reacted in early 2014 by demanding that Syngenta halt commercialization of Viptera, as well as a new product, Agrisure Duracade. Duracade contained both MIR162 and a new trait called Event 5307, which was also not approved by China and other key export markets. Syngenta petitioned the USDA for deregulation of Duracade in 2011, and approval was granted for that product in 2013. Industry participants raised "grave concerns about the serious economic harm" to those in the industry, including farmers, from the loss of the Chinese market. The National Grain and Feed Association quantified the harm at that time as ranging from $1 billion to $2.9 billion.

Syngenta again ignored the pleas. Instead, it continued to sell Viptera and launched Duracade for the 2014 crop year. These actions prolonged the problem and expanded the economic and property loss to farmers, including Plaintiff, and the Washington class. Corn grown by farmers who did not purchase Syngenta's products had become contaminated with the MIR162 and Event 5307 traits through cross-pollination from neighboring fields. In addition, Viptera- and Duracade-grown corn was commingled with other corn in grain elevators and other storage facilities.

During this process, Syngenta actively misled farmers, including Plaintiff and the Washington class. For instance, Syngenta represented repeatedly that China would approve MIR162 in March 2012, even though it knew that approval in that

CLASS ACTION COMPLAINT – 5

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

1   time-frame was extremely unlikely. Syngenta also made false representations about

2   measures it would take to prevent genetically-altered crops from contaminating other

3   crops. Syngenta went so far as to represent to the USDA that "there should be no

4   effects on the U.S. maize export market" from deregulation, and that it would impose

5   stewardship and channeling requirements to steer Viptera corn away from

6   unapproved export markets. Syngenta, however, did not follow through in any

7   meaningful way on these commitments. In fact, Syngenta actually increased the risk

8   of contamination and commingling of Viptera. For example, when Bunge North

9   America, Inc. ("Bunge") refused to accept Viptera corn, hoping to minimize the risk

10  of MIR162 contaminating shipments bound for China, Syngenta sued in an attempt

11  to force Bunge to accept its unapproved product.

12      Syngenta's actions foreclosed the China market for U.S. corn exports for an

13  extended time and with a lasting, material impact since it reopened. The loss and

14  subsequent negligible return of this market, which the USDA had predicted to be the

15  largest export market for corn by 2020, has caused enormous harm to corn growers,

16  including Plaintiff and the Washington class. That harm continues to grow. China

17  approved MIR162 in December 2014; however, it still has not approved Event 5307.

18  U.S. corn exports to China have not yet begun to recover, and it remains to be seen

19  whether they will ever regain the levels they would have attained if not for the

CLASS ACTION COMPLAINT – 6

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

Syngenta trade disruption.

This action seeks reparation for Plaintiff and the Washington class, which includes thousands of Washington corn growers, who have suffered substantial losses as a direct result of Syngenta's irresponsible conduct, and damages for Syngenta's willful harm to the U.S. corn industry.

## I.      JURISDICTION AND VENUE

1.      This Court has jurisdiction and venue over the parties and the subject matter of this civil action because distribution and warranting and damages and injuries regarding Syngenta's Viptera and Duracade corn occurred in Franklin County, Washington, and the distribution and warranting and damages and injuries regarding Syngenta's Viptera and Duracade corn are all substantial parts of the events giving rise to the claims set forth below.

2.      Plaintiff does not assert any claims arising under federal law.

3.      The Court has specific personal jurisdiction over Syngenta because the episodes-in-suit occurred in this forum, Syngenta has purposely availed itself of the privileges and benefits of doing business in Washington, it has transacted business in Washington, and has committed acts outside of Washington that have caused injury or property damage in Washington.

4.      Syngenta is personally subject to specific jurisdiction in this Court:

CLASS ACTION COMPLAINT – 7

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

a.  Because Syngenta is subject to the Washington long-arm statute by doing business in Washington and by contracting with Washington residents and by performing such contracts in part in Washington and by committing torts where one or more elements of the tort or one or more of the tortious acts occurred in Washington.

b.  Because the episodes-in-suit which serves as the basis of the claims against Syngenta in this case is related to Syngenta's conduct

c.  Because Syngenta participated in placing the Viptera and Duracade corn at issue into the stream of commerce;

d.  Because Syngenta expected and intended that Viptera and Duracade would be sold and used/planted in Washington;

e.  Because key elements of the episodes-in-suit occurred in Washington;

f.  Because Syngenta has purposely availed itself the benefits of doing business in Washington;

g.  Because Syngenta's contacts with Washington principally relate to the placement of Viptera and Duracade corn into the stream of commerce, and all of the conduct associated with placing Viptera and Duracade into the stream of commerce in Washington and

CLASS ACTION COMPLAINT – 8

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

associated with this civil action is related to and connected with the placement of Viptera and Duracade corn into the stream of commerce;

h. Because due process and fair play and substantial justice are honored by this civil action going forward in this Washington Court;

i. Because there is little or no burden on Syngenta litigating this case in this Washington Court;

j. Because it would be a tremendous burden and great insufficiency and unnecessary delay imposed on the Plaintiff and the Washington Class to litigate this case in another forum;

k. Because Washington has an interest in overseeing this litigation which involves injuries to Washington residents and tortious transactions which occurred in Washington and Syngenta products at issue sold in Washington;

l. Because public policy favors resolution of this dispute in this Washington Court; and

m. Because Syngenta's conduct and connection with Washington are such that Syngenta should reasonably anticipate being haled into court in Washington.

CLASS ACTION COMPLAINT – 9

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

5.    Syngenta cannot deny person jurisdiction:

a.  Because Syngenta placed the Viptera and Duracade corn into the stream of commerce in Washington state

b.  Because claims against Syngenta relate to and are connected with this transaction involving the Viptera and Duracade corn placed by Syngenta into the stream of commerce in Washington state

c.  Because Syngenta placed the Viptera and Duracade corn into the stream of commerce under circumstances such that Syngenta should reasonably anticipate being haled into court in Washington;

d.  Because Syngenta maintains an active and interactive website where it can exchange information with Washington residents at http://www.syngenta-us.com/contact-us where Washington residents can purchase products online and where Syngenta directs Washington residents to local retail shops located in Washington, at http://www.syngenta-us.com/rep-finder;

e.  Because Syngenta has a regular plan for the distribution of its products within Washington with the goal of achieving a commercial benefit from the sale of those products in Washington;

f.  Because Syngenta places its products into the stream of commerce

CLASS ACTION COMPLAINT – 10

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

by targeting Washington through Washington authorized retailers in Washington.

6.     Venue is also proper in this District under RCW 4.12.025 because transacts business in this District and because Syngenta has marketed, sold, or otherwise disseminated, and continues to market, sell, or disseminate Viptera and Duracade corn in this District, and throughout Washington.

## II.     PARTIES

### A.     Plaintiff

7.     Chep R. Gauntt ("Plaintiff") is a citizen of Washington residing in Pasco, Franklin County, Washington.  Plaintiff is engaged in the business of planting, growing, harvesting and selling corn.  Plaintiff does not buy corn seed with Syngenta's MIR162 event, including Viptera and Duracade.  Rather, Plaintiff only buys corn seed that has either not been genetically modified or corn seed genetically modified with traits that have been approved by all major corn importing countries, including China. At all times relevant to this action, Plaintiff has been engaged in corn farming in the State of Washington.  Plaintiff received income from the ultimate sale of corn grown on his farmland.

### B.     Defendants

8.     Syngenta Seeds, Inc. is a Delaware corporation with its principal place

CLASS ACTION COMPLAINT – 11

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

of business at 11055 Wayzata Boulevard, Minnetonka, Minnesota 55305-1526. Syngenta Seeds is a direct subsidiary of Syngenta Corporation and described itself in its Complaint filed in *Syngenta Seeds, Inc. v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB, United States District Court, Northern District of Iowa ("*Syngenta v. Bunge*"), as

> a leading agribusiness company committed to sustainable agriculture through research and technology. Syngenta is, among other things, in the commercial seed business. It develops, produces, and sells, through dealers and distributors or directly to growers, a wide range of agricultural products, including corn and soybean seed exhibiting useful traits that have been developed with the techniques of modern biotechnology. The seed products are then grown and harvested as raw materials for the production of biofuels or grain for livestock feed; or are milled and processed for food products.

Among Syngenta Seeds' products that it has sold in the State of Washington are the Viptera and Duracade variety of corn seeds that are at issue here. These seeds express, or contain, genetically-engineered traits that were designed to confer resistance to insects.

9.     Syngenta AG is a corporation organized and existing under the laws of Switzerland with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland. Syngenta AG is a publicly traded company on the Swiss stock exchange.  American Depositary Receipts for Syngenta AG are traded on the New York Stock Exchange.  Syngenta AG was formed in 2000 as a result of the

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

merger of Novartis Agribusiness and Zeneca. Agrochemicals and is the only publicly traded company among the various Syngenta entities named as defendants in this case. Syngenta AG may be served with process under Rules 4(h)(2) and 4(f)(1), Fed.R.Civ.P., and in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters by forwarding two copies of the citation and this Class Action Complaint in English, along with two copies of the citation and Class Action Complaint translated into German, to: Appellationsgericht, Basal-Stat, Baumleigasse 1, 4051 Basal, Switzerland.

10.    Crop Protection AG is a corporation organized and existing under the laws of Switzerland with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland. Upon information and belief, Crop Protection AG is a subsidiary of Syngenta AG. Crop Protection AG may be served with process under Rules 4(h)(2) and 4(f)(1), Fed.R.Civ.P., and in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters by forwarding two copies of the citation and this Class Action Complaint in English, along with two copies of the citation and Class Action Complaint translated into German, to: Appellationsgericht, Basal-Stat, Baumleigasse 1, 4051 Basal, Switzerland.

CLASS ACTION COMPLAINT – 13

11.     Syngenta Corp. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3411 Silverside Road # 100, Wilmington, Delaware 19810-4812. Syngenta Corp is a subsidiary of Syngenta AG. Syngenta Corp does not have a registered agent in the State of Kansas and may be served with process under Rule 4(h)(1)(A) and (B) by sending by registered or certified mail the citation and this Class Action Complaint to: Cheryl Quain (or successor), Corporate Secretary, Syngenta Corporation, 3411 Silverside Road, Suite 100, Shipley Building, Wilmington, Delaware 19810, and The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

12.     Crop Protection LLC is a limited liability company organized and operating under the laws of the State of Delaware with its principal place of business at 410 South Swing Road, Greensboro, North Carolina 27409-2012. Crop Protection LLC is a subsidiary of Syngenta Seeds. Crop Protection LLC may be served under Rule 4(h)(1)(A), Fed. R. Civ. P., by and through its registered agent, The Corporation Company, Inc., 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603.

13.     Syngenta Biotech is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at P.O.

CLASS ACTION COMPLAINT – 14

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525 Fax: 206/223-8224

Box 12257, 3054 East Cornwallis Road, Research Triangle Park, North Carolina 27709-2257. Syngenta Biotech is a subsidiary of Syngenta Seeds and traces its operations back to CIBA-Geigy Corporation, a legacy company of Syngenta. Syngenta Biotech may be served under Rule 4(h)(1)(A) and (B), Fed. R. Civ. P., through its registered agent, by sending by registered or certified mail the citation and this Class Action Complaint to: Corporate Secretary, c/o Cheryl Quain (or successor), Syngenta Biotechnology, Inc., 3411 Silverside Road, Suite 110, Shipley Building, Wilmington, Delaware 19810, and The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Syngenta Biotech field tested under permits issued by or notifications to, and made application for deregulation by, the United States Department of Agriculture ("USDA") of the genetically modified corn traits MIR 162 and Event 5307. At least 4 of the field tests of MIR 162 and 2 of the field tests of Event 5307 occurred at test sites within the State of Kansas. MIR 162 is used in Agrisure Viptera® corn and both MIR 162 and Event 5307 are used in Agrisure Duracade™ corn.

14.    Upon information and belief, the Defendants acted in concert pursuant to agreements or other arrangements to act in a collective manner regarding the actions and events made the subject of this Class Action Complaint. All Defendants are therefore jointly and severally liable for the acts for which the Plaintiffs make

CLASS ACTION COMPLAINT – 15

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525 Fax: 206/223-8224

complaint.

## III.   FACTUAL ALLEGATIONS

15.    Syngenta along with Plaintiff and the Washington class are part of an interconnected industry and market that demands and expects all market participants to act, at least in part, for the mutual benefit of all others in their interconnected web.

16.    Syngenta's commercialization of genetically modified seeds directly impacts the farmers of Washington, irrespective of whether they choose to purchase and plant Syngenta's genetically modified products, including specifically Plaintiff and the Washington class.

17.    Biotechnology firms such as Syngenta develop and obtain patents on their bio-engineered products, in this instance seeds. These products are also referred to as genetically-modified organisms, or "GMOs." A patent gives the biotechnology firm the exclusive right to sell its bio-engineered products; however, those patents eventually expire. Biotechnology firms have an economic incentive to "commercialize" (i.e. bring their products to market for planting and harvest) as soon as possible after filing a patent application to maximize profitability.

18.    Syngenta must act responsibly when commercializing new products containing genetically modified traits. All industry participants, including Syngenta, understand that irresponsible commercialization of a new genetically modified

CLASS ACTION COMPLAINT – 16

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

product can cause major trade disruption and massive harm to farmers, including Plaintiff and the Washington class. That is why industry leaders, including Syngenta, have pledged to stakeholders, including Plaintiff and the Washington class, that they will act responsibly in introducing new genetically modified traits.

19.    Syngenta set a market share goal for MIR162 by 2014 and sought to achieve commercialization as soon as possible.

20.    Premature commercialization poses a well-known and significant risk of harm to Plaintiff and the Washington class if bio-engineered commodity products are commercialized before they are approved by key importing nations. Certain importing nations, such as China, have a "zero tolerance" policy and will reject grain imports from the United States if they detect the presence of even trace amounts of an unapproved bio-engineered genetic trait in grain shipments. This was well known in the biotechnology industry, including Syngenta, by 2007 at the latest.

21.    Syngenta commercialized MIR162 in Viptera and Event 5307 in Duracade despite clear risk of harm to its stakeholders, including the Plaintiff and the Washington class, despite Syngenta's knowledge of that risk, and despite Syngenta's own professed commitment to responsible management.

22.    Moreover, Syngenta commercialized Viptera by consistently misrepresenting both the importance and status of China's approval, and without

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525  Fax: 206/223-8224

adequate systems in place to isolate or channel Viptera, virtually assuring that Viptera would contaminate the U.S. corn supply.

### A.    Recognized Risk of Irresponsible Commercialization

23.    As recognized within the industry, including by Syngenta, the harm threatened by irresponsible commercialization is very real.

24.    "There have been a number of high-profile cases involving genetically modified varieties ... and disruption of international shipments of commodity grains such       as       corn,       wheat,       and       rice." http://www.syngentafoundation.org/index.cfm?pageID=703.

25.    For example, bio-engineered corn contaminated the U.S. corn supply in 2000 and disrupted international trade causing loss to growers. *See In re StarLink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828 (N.D. Ill. 2002).

26.    In 2006, bio-engineered rice contaminated the U.S. rice supply, again disrupting trade and causing massive damages to U.S. rice growers. *See In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004 (E.D. Mo. 2009); *Bayer CropScience LP v. Schafer*, 385 S.W.3d 822 (Ark. 2011).

27.    In addition to being aware of these and other well-publicized incidents at the time it commercialized Viptera and Duracade, Syngenta had (and has been)

CLASS ACTION COMPLAINT – 18

continuously warned by stakeholders about the importance of, and need for, responsible commercialization.

28.    For example, when Syngenta commercialized MIR604 (Agrisure® RW) in 2007, the National Grain and Feed Association ("NGFA") (of which Syngenta is a member) and the North American Export Grain Association ("NAEGA") warned against an "'ill-conceived' plan to commercialize" Syngenta's Agrisure biotechnology-enhanced corn as endangering U.S. corn and corn-product exports, because Syngenta had not obtained regulatory approval for food and feed use in Japan and other U.S. export markets. *See* Houin, "Feed and grain organizations warn growers of limited export markets," Farm World (4/25/2007).

29.    The International Grain Trade Coalition also chastised Syngenta, stating that Syngenta "did not respect the responsibility of importing governments to perform necessary risk assessments as demanded by their legislation," that the introduction of Agrisure® RW "was not done in an open transparent manner," and that Syngenta "did not complete authorization in major international markets possessing scientifically sound approval systems prior to commercialization." Letter from International Grain Trade Coalition to Michael Pragnell, CEO Syngenta dated April 18, 2007, p2. The International Grain Trade Coalition further stated that Syngenta's conduct "[e]xposed downstream members of the value chain including

CLASS ACTION COMPLAINT – 19

producers, handlers, exporters, importers, food processors and distributors to significant liability as currently all countries employ a zero threshold policy for an event not authorized by the importing country" and strongly urged Syngenta to "reverse immediately its decision to commercialize Agrisure RW at this time." *Id.*

30.     The Biotechnology Industry Organization ("BIO") is the world's largest biotechnology trade association, of which Syngenta is or was a member. BIO has expressly recognized that "[a]synchronous authorizations combined with importing countries maintaining 'zero tolerance' for recombinant-DNA products not yet authorized results in the potential for major trade disruptions." BIO Product Launch Stewardship Policy, May 21, 2007, at Annex 1 Introduction; *see also* BIO Product Launch Stewardship, December 10, 2009, at Annex 1 Introduction (same); BIO "Stewardship: Actions to be Taken Prior to Launching Special Traits," October 4, 2010, at Annex 1 Introduction (same); BIO Product Launch Stewardship: Food and Agriculture Section, November 27, 2012, at Annex 1 Introduction (same).

31.     As stated in BIO's December 10, 2009 "Product Stewardship Policy":

> Since the commercial introduction of biotechnology-derived plant products in 1996, an increasing number of biotechnology-derived plant products intended for food or feed use are authorized for commercial production in many countries throughout the world; however, authorizations in importing countries vary depending on the timing of submissions for import authorization as well as the duration of the authorization process in each country. As a consequence of these asynchronous

CLASS ACTION COMPLAINT – 20

authorizations, low levels of recombinant-DNA plant materials that have completed full safety assessments in accordance with national and international standards in one or more countries may, on occasion, be present in food or feed in countries in which the authorization process of the relevant recombinant-DNA plant material has not been completed. Asynchronous authorizations combined with importing countries maintaining 'zero tolerance' for recombinant-DNA products not yet authorized results in the potential for major trade disruptions.

http://www.bio.org/sites/default/files/Product_Launch_Stewardship_12_10_09.pdf.

## B.   Syngenta Recognizes Its Stewardship Obligation

32.    Under the "Corporate Responsibility" section of its website, Syngenta acknowledges the inter-connected nature of the commodity market and its responsibility to stakeholders affected by its business, including but not limited to Plaintiff and the Washington class:

Our stakeholders are the people who can affect our business or who are affected by it. They include the following groups:

Growers

Industry

Non-governmental organizations and international agencies

Investors

Employees

Government

CLASS ACTION COMPLAINT – 21

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

33.     Syngenta has committed to "respond to feedback from its stakeholders" and "to implement high standards of stewardship for the safe, effective and environmentally responsible use of its products." http://www.syngenta.com/global/corporate/en/about-syngenta/corporate-responsibility/ Pages/cr-policy-and-commitments.aspx.

34.     Syngenta represents that "it prioritize[s] the issues that are most relevant to our business and most important to our stakeholders." http://www.syngenta.com/global/corporate/en/about-syngenta/corporate-responsibility/pages/focus-areas.aspx

35.     Syngenta also represented that it maintains high standards and even eclipses regulatory requirements.

36.     In Syngenta's "Code of Conduct," posted on its website for all stakeholders to read, Syngenta represents:

- "The trust and confidence of Syngenta's stakeholders is critical to our continuing success and will only be sustained if the company acts and is seen to act in accordance with the highest standards of ethics and integrity. To ensure we meet the standards which our stakeholders expect, we have produced this new Syngenta Code of Conduct . . . ."

- "We provide innovative, reliable, high-quality products and have safeguards to protect stakeholders."

- "The creativity of our people provides products which help growers meet the global challenges to agriculture."

CLASS ACTION COMPLAINT – 22

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

- "We will work closely with customers, contractors, users and all other stakeholders to ensure proper and responsible use of our products and understanding of the precautions that apply ...."

37.    In November 2007, Syngenta adopted its own "Bio Product Launch Policy." The Syngenta Bio Product Launch Policy incorporates BIO's Product Launch Policy and requires Syngenta to perform a market and trade assessment to identify key importing nations and obtain those nations' approval before commercializing a new bio-engineered product. http://www.syngentabiotech.com/biopolicy.aspx.

38.    On its website, Syngenta also suggests that it complies with the stewardship standards adopted by CropLife International and Excellence Through Stewardship, advising farmers that they may learn more about "stewardship" by visiting the provided links. *See* http://www.syngentabiotech.com/BioStewardshipLinks.aspx.

39.    It is clear that the importance of obtaining import approval from key markets was well known and recognized within the biotechnology industry and by Syngenta before Syngenta commercialized MIR162 under the Viptera brand name and trademark for the 2011 crop year.

40.    Syngenta committed to not commercializing new genetically modified traits that had not been approved by key import markets. *See, e.g.*, BIO Product

CLASS ACTION COMPLAINT – 23

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

Launch Policy, Syngenta Implementation Principles (Nov. 2007). Syngenta clearly knew the risks of premature commercialization and knew that without stringent containment and channeling procedures, Viptera would contaminate the U.S. corn supply and move to export markets, causing significant trade disruption, as set out below. Based on clear warnings and its own knowledge, Syngenta knew, or plainly should have known that China was a key and growing market. Responsible practice dictated that Syngenta not commercialize Viptera, and certainly not do so without adequate containment and effective channeling measures in place, before obtaining import approval. Syngenta, however, did just the reverse.

### C.    Regulation, Testing, and Deregulation of MIR162

41.    The process of commercialization begins with obtaining approvals from U.S. agencies, including but not limited to deregulation from the Animal, Plant, and Health Inspection Service ("APHIS") of the USDA.

42.    The regulations in 7 C.F.R. part 340 (the "GMO Regulations") regulate, among other things, the introduction (importation, interstate movement, or release into the environment) of organisms and products altered or produced through genetic engineering that are plant pests or that there is reason to believe may be plant pests. Such genetically-engineered organisms and products are considered "regulated

CLASS ACTION COMPLAINT – 24

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

articles." The GMO Regulations were promulgated under the Plant Protection Act (the "PPA"), 7 U.S.C. § 7701, *et seq*., or its predecessor statutes.

43.    MIR162 is a genetically modified trait that before its deregulation, was regulated by the USDA under the PPA and GMO Regulations.

44.    The GMO Regulations at 7 C.F.R. §§ 340.3 and 340.4 allow release into the environment of regulated, genetically modified traits, such as MIR162, before their deregulation, through field trials conducted under permits issued by, or notifications to, APHIS. Developers who field test genetically modified traits, such as Syngenta Biotech in its field testing of MIR162, are required to adhere to certain performance standards in the GMO Regulations to ensure the regulated genetically modified organism does not persist in the environment or enter the food or feed supply. Similarly, at the end of all field tests, developers must destroy or properly contain any viable plant material in the field and ensure no regulated material persists in the environment beyond the duration of the trial.

45.    Syngenta experienced prior problems releasing regulated GMO events. In 2005, Syngenta entered into a settlement with the USDA ($375,000 fine plus a required training program) stemming from its release of still-regulated Bt10 corn, which Syngenta supplied as deregulated Bt11 corn between 2001 and 2004. About 14,000 bags of Bt10 seeds were sold from 2001 to 2004, mainly to U.S. farmers but

CLASS ACTION COMPLAINT – 25

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

also in Canada and Argentina. The Bt10 event was found in at least five Bt corn breeding lines in the U.S, and it was estimated that the seeds could have been planted on 37,000 acres in the U.S, producing "an estimated 150,000 tons of corn from this area" and accounting for approximately .01% of the total U.S. corn acreage. *See* New York Times, "U.S. Fines Swiss Company Over Sale of Altered Seed," (Apr. 9, 2005); PR Newswire, "Syngenta Agrees to Settlement With USDA on Unintended Bt10 Corn" (http://www.prnewswire.com/news-releases/syngenta-agrees-to-settlement-with-usda-on-unintended-bt10-corn-54220787.html). Syngenta later paid a $1.5 million fine to the EPA, which conducted an investigation confirming the distribution of unregistered Bt10 corn on "over 1000 occasions." EPA News Release "EPA Fines Syngenta $1.5 Million for Distributing Unregistered Genetically Engineered Pesticide." (Dec. 21, 2006).

46.    Between 1999 and 2007, Syngenta Biotech conducted at least 119 field trials of MIR162 corn under at least 20 permits issued by, or notifications to, APHIS under the GMO Regulations at sites in 31 states.

47.    The GMO Regulations in 7 C.F.R. § 340.6(a) provide that any person may submit a petition to APHIS seeking a determination that an article should not be regulated under 7 C.F.R. §340.

CLASS ACTION COMPLAINT – 26

48.    On May 24, 2007, Syngenta filed a patent application for MIR162 to secure its exclusive right to market that corn trait, pending regulatory approval by the USDA.

49.    On or about September 10, 2007, Syngenta Biotech submitted a petition (the "MIR162 Deregulation Petition") seeking a determination of nonregulated status (APHIS Petition Number 07-253-01p) for corn (Zea mays L.) designated as transformation event MIR162, which has been genetically engineered for insect resistance, stating that MIR162 is unlikely to pose a plant pest risk and, therefore, should not be a regulated article under the GMO Regulations.

50.    Syngenta Biotech continued its field tests of MIR162 under the GMO Regulations during the approximately 31-month period after filing the MIR162 Deregulation Petition and the USDA decision deregulating MIR162 in April 2010.

51.    Syngenta Biotech stated in the MIR162 Deregulation Petition that it understood "that a copy of the MIR162 Deregulation Petition may be made available to the public as part of the public comment process." MIR162 Deregulation Petition at 3 of 268. APHIS's notice, published in the Federal Register on January 13, 2010 (75 Fed. Reg. 1749) (the "MIR162 Deregulation Notice"), expressly invited public comment regarding the MIR162 Deregulation Petition and further provided instructions as to how copies of the petition and accompanying draft environmental

CLASS ACTION COMPLAINT – 27

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

assessment and plant pest risk assessment could be obtained either by placing a phone call or accessing them on the internet.

52.     In a preliminary observation to Section IX of the MIR162 Deregulation Petition, entitled "Adverse Consequences of Introduction" (the "Adverse Consequences Discussion"), Syngenta Biotech represented that it knew "of no data or observations that indicate [that] MIR162 would adversely impact the quality of the human environment, directly, indirectly, or cumulatively. This includes a lack of anticipated effects on ... the economy, either within or outside the U.S."

53.     Specifically, among the matters addressed in the Adverse Consequences Discussion were "Economic Impacts" at Section IX.D. In the introduction to that section, at pages 108-09, Syngenta Biotech stated:

> Economic considerations are not explicitly described in the factors listed in 40 CFR § 1508.27. However, economic impacts do relate to the significance of the requested action and have been considered by some courts in reviewing NEPA [National Environmental Policy Act] compliance.

54.     The economic impacts discussed included the "Effects on the Export Market," at Subsection IX.D.4, page 111, which included Syngenta Biotech's representation that "there should be no effects on the U.S. maize export markets" and advised that applications for approval of MIR162 maize were in process in a

CLASS ACTION COMPLAINT – 28

number of such export markets with "functioning regulatory systems," including

China, stating:

> There should be no effects on the U.S. maize export market since
> **Syngenta is actively pursuing regulatory approvals** for
> MIR162 maize in countries with functioning regulatory systems
> for genetically modified organisms and that import maize from
> the U.S. or Canada. Regulatory filings for MIR162 maize are in
> process for Colombia, Japan, South Korea, Taiwan, China, the
> Philippines, Australia and New Zealand, South Africa, the
> European Union, Russia, and Switzerland. (Emphasis added).

55.    Other portions of the MIR162 Deregulation Petition made similar

representations regarding China.

56.    Syngenta Biotech also stated in Subsection IX.D. of the MIR162

Deregulation Petition that stewardship agreements with growers would require

channeling of MIR162 away from export markets that had not approved import of

MIR162 maize, that Syngenta would undertake "a wide-ranging grower education

campaign" respecting channeling, and that channeling would be effective based on

prior experiences with the specialty maize market:

> Syngenta's stewardship agreements with growers will include a
> term requiring growers to divert this product away from export
> markets (i.e. channeling) where the grain has not yet received
> regulatory approval for import. Syngenta will communicate
> these requirements to growers using a wide-ranging grower
> education campaign (e.g., grower Stewardship Guide). As noted
> in the context of the IRM program, these procedures are not
> hypothetical.

> The ability to channel particular types of maize for particular

CLASS ACTION COMPLAINT – 29

uses, such as the export market, is demonstrated by the continuing success of the specialty maize market. Use of identity preservation measures has enabled growers to maintain a wide variety of specialized maize products, including white food maize, waxy maize, hard endosperm maize, high oil maize, nutritionally enhanced maize, high extractable starch maize, non GMO maize, and organic maize (U.S. Grains Council, 2006). Channeling programs are well established for separating each of these maize varieties. As set out above, these practices have continued successfully long after the introduction of numerous varieties of transgenic maize.

57.    The stewardship agreements to which Syngenta Biotech referred were later used between some growers and Syngenta Seeds, but were often sent after planting.

58.    In December 2009, based on its review of the MIR162 Deregulation Petition, APHIS prepared a Draft Environmental Assessment that parroted what Syngenta Biotech had represented in the MIR162 Deregulation Petition:

There should be no effects on the U.S. corn export market since Syngenta is actively pursuing regulatory approvals for the MIR162 corn in countries with functioning regulatory systems for genetically modified organisms and that import corn from the U.S. or Canada. Regulatory filings for the MIR162 corn are in process for ... China.

59.    The Draft Environmental Assessment was among the documents publicly available under the MIR162 Deregulation Notice.

60.    On April 12, 2010, APHIS concluded that MIR162 corn should be deregulated. *See* Determination of Nonregulated Status for MIR162 Corn (Apr. 12,

CLASS ACTION COMPLAINT – 30

2010); *see also* Syngenta Biotechnology, Inc. Determination of Nonregulated Status for Corn Genetically Engineered for Insect Resistance, 75 Fed. Reg. 20560 (Apr. 20, 2010).

61.    Before making that determination, APHIS, on April 9, 2010, issued its National Environmental Policy Act Decision and Finding of No Significant Impact and, in March 2010, issued its Final Environmental Assessment. APHIS compared the anticipated impact by taking no action (i.e., keeping MIR162 as a regulated article) with deregulating MIR162 and concluded in the Finding of No Significant Impact that in each instance the impact on the "Export Market" would remain "unchanged." Similarly, in the Final Environmental Assessment dated March 2010, APHIS adopted and repeated Syngenta's representations that it did not expect any effects on the U.S. corn export market "by the cultivation of the MIR162 corn cultivars" and that applications to countries with functioning regulatory systems, including China, were in process.

62.    Thereafter, on April 21, 2010, Syngenta issued its press release, "Syngenta receives approval for breakthrough corn trait technology in the U.S." (Apr. 21, 2010). In making the announcement that MIR162 had been deregulated, Syngenta noted the plans for its imminent commercialization, stating that "[t]he trait will be combined with the Agrisure 3000GT trait stack to provide corn growers with

CLASS ACTION COMPLAINT – 31

broad-spectrum, insect control and glyphosate tolerance for maximum convenience and productivity" and that "Syngenta plans to commercialize hybrids containing the Agrisure Viptera trait for the 2011 growing season."

63.    The April 21, 2010 press release confirms that the MIR162 Deregulation Petition was a document prepared and published by Syngenta for the sole purpose of facilitating, promoting, and inducing the commercial sale of its products containing the MIR162 trait. The MIR162 Deregulation Petition contained statements and representations to induce APHIS to deregulate MIR162, thereby beginning the commercialization of the product. Further, the MIR162 Deregulation Petition was filed with full knowledge that the statements and representations therein would be published to stakeholders, including Plaintiff and the Washington class. The commercial nature of the statements in the MIR162 Deregulation Petition is clear: In explaining the rationale of the MIR162 Deregulation Petition, Syngenta stated that "[t]ransformation event MIR162 maize has been developed by Syngenta to provide growers with maize varieties that are resistant to feeding damage caused by a number of significant lepidopteran insect pests. This trait will be offered to growers in combination with other deregulated maize traits." MIR162 Deregulation Petition at 11. The MIR162 Deregulation Petition espoused the sale of the product to growers, and was rife with representations about the commercial benefits of

CLASS ACTION COMPLAINT – 32

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

Syngenta's product and expected market impact. The following further indicates that Syngenta made commercial representations in the MIR162 Deregulation Petition:

    a. "Transformation event MIR162 has been developed by Syngenta to provide U.S. growers with maize hybrids that are resistant to feeding damage caused by a number of lepidopteran insect pests. … Commercialization of this new trait has the potential to reduce conventional insecticide use in maize, increase grower profits, and improve grain quality." (p.13);

    b. "[I]t [MIR162] will be commercialized as a combined-trait hybrid with Syngenta's Bt11 maize event." (p.96);

    c. Syngenta's numerous references to and representations regarding the commercial benefits to farmers from introduction of MIR162. (*see, e.g.*, pp. 5, 97, 109 (enhanced productivity), p.110 (increased competition and farmer and consumer choice));

    d. Syngenta's repeated observations that no adverse consequences should occur to the economy, either within or outside the United States (*see e.g.*, p.5) and the statements regarding the lack of impact on exports and intended channeling away from export markets that had yet to approve MIR162 as alleged above;

    e. An appendix report regarding the economic implications of the introduction of MIR162; and

    f. Syngenta's acknowledgement that the MIR162 Deregulation Petition would be made available to the public as previously alleged (p.3).

    64. Contrary to Syngenta's representations that its regulatory filings were "in process" in China, Syngenta first sought regulatory approval for MIR162 from China's Ministry of Agriculture three years later, in or around March 2010. *See*

CLASS ACTION COMPLAINT – 33

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525 Fax: 206/223-8224

http://www.syngenta-us.com/viptera_exports/images/MIR162-Regulatory-Timeline-9-2014.pdf.

65.    Consistent with its statements to the USDA in the MIR162 Deregulation Petition, Syngenta considered China to have a functioning and predictable regulatory system.

D.    **Syngenta's Initial Commercialization**

66.    As Syngenta knows, nothing about USDA deregulation requires a developer such as Syngenta to commercialize.

67.    Responsible practice dictated Syngenta obtain import approval from key market countries before commercialization (or at minimum, before first planting). *See, e.g.*, BIO Product Launch Stewardship, December 10, 2009, at p.4.

68.    As early as 2009, Syngenta acknowledged that China was a key export country.

69.    In a presentation to the NGFA in 2010, Syngenta listed China as among "key import approvals" it was or would be seeking. *See* PowerPoint titled "2010 Syngenta Pipeline," Presentation to the National Grain and Feed Association.

70.    Syngenta, however, knew well that it would not have import approval from China for the 2011 crop year.

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

71.    The typical time period for import approval from China at that time was approximately 2-3 years.

72.    Syngenta was not even projecting approval from China for the 2011 crop year but rather, was hoping for approval by the 2012 crop year.

73.    Syngenta privately planned from the outset to commercialize Viptera with or without China's regulatory approval, notwithstanding the commitments it had made to stakeholders and industry participants not to commercialize genetically modified traits until after approval from key export markets.

74.    Syngenta commercialized Viptera for the 2011 growing season despite the lack of regulatory approval from China, and despite Syngenta's knowledge that China was a key (and growing) export market for U.S. corn.

75.    Syngenta did not disclose these facts to Plaintiff, the Washington class, or growers that purchase Viptera, despite knowing that the failure to obtain regulatory approval in China would have significant impact on the crops and/or property of all corn farmers, including those who did not purchase or plant Viptera, including the Plaintiff and members of the Washington class.

76.    Syngenta was well aware in 2010 of the strong likelihood that China would be a significant import market by 2011.

CLASS ACTION COMPLAINT – 35

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

77.    It was well known at least by August 2010 that China was an important and growing export market for US corn. As reflected in a trade publication at the time:

> China is entering a 'new era' of corn buying. The world's most populous country may import as much as 15 million tons of corn in 2015, according to the U.S. Grains Council. ... Chinese imports of corn will grow from 1.7 million tons in 2010 to 5.8 million tons in 2011, and to 15 million tons in 2014-15, according to Hanver Li, Chairman of Shanghai JC, speaking to the U.S. Grains Council.... Where will China import all this corn from? The first place they will turn is the U.S., which is the world's largest corn exporter, accounting for 60% of global corn exports in 2009.... If China imports an incremental 600 million bushels of corn in 2014 from the U.S., using the USDA's baseline projections, U.S. corn ending stocks would be 960 million bushels. This would put the Ending Stocks to Use Ratio at 6.3%, the lowest level since 1995. 2010 is a major turning point in the grain market. The Chinese transition to becoming a net importer of corn will have a substantial implication on the world's corn supply.

http://www.farmlandforecast.com/2010/08/chinese-imports-to-change-grain-markets/.

78.    Syngenta was, and continues to be, a member of the U.S. Grains Council. Indeed, Syngenta's Rex Martin has, on information and belief, actively participated as a member of the Council's Biotechnology Advisory Team.

79.    In addition, NAEGA warned Syngenta of the importance of obtaining Chinese regulatory approval before launch during a meeting in or around August

CLASS ACTION COMPLAINT – 36

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525  Fax: 206/223-8224

2010 with NGFA's Biotechnology Committee. *See* July 14, 2011 NGFA Newsletter. The same issue was discussed at the subsequent NGFA Biotechnology Committee meetings – during the March 2011 convention and another meeting on June 29, 2011 in Washington.

80.    Syngenta knew of NAEGA's warning by the summer of 2010 and also knew of NAEGA's position that import approval should be obtained from China before commercializing Viptera.

81.    Nevertheless, Syngenta refused to stop its commercialization of Viptera in 2010 for planting and harvest in 2011.

82.    In the fall of 2010, NGFA, in a private meeting with David Morgan, Regional Director of North America and President of Syngenta Seeds, also urged Syngenta to delay commercialization of Viptera, emphasizing the risk of trade disruption with China.

83.    On October 29, 2010, a Reuters article was circulated among Syngenta executives stating: "Chinese corn imports have rocketed this year and are expected to continue growing next year, after China's own harvest couldn't keep up with a boom in demand...."

84.    Evidence of China's importance continued to mount before planting in 2011.

CLASS ACTION COMPLAINT – 37

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

85.    In January 2011, Syngenta knew that China had become the second most important market for U.S. corn.

86.    The USDA's long-term projections, compiled in November 2010 and issued in February 2011, forecast dramatic increases in China's imports of corn from the USDA's prior year's projections. As stated by the USDA, the "increase in China's imports account for one-third of the growth in world corn trade."

87.    As early as 2011, Syngenta knew that China's import requirements influenced global commodity prices and understood the risk of proceeding with commercialization without approval from China.

88.    At the time it was marketing and selling Viptera – and before planting in 2011 – Syngenta clearly knew of China's importance.

89.    In a June 2010 Risk Management Report," Syngenta recognized that MIR162 [would be] detected as unapproved trait" as a consequence of large scale production "before all import approvals are in place." The report recognized that increased production in 2010 of corn containing MIR162 increased the "likelihood of MIR162 being detected as [adventitious presence] in an export channel." Syngenta classified the impact of this risk as "high." Risk Management Report, dated June 2010; *see also* MIR162 & EU approvals PowerPoint attached to e-mail from David O'Reilly, dated Oct. 21 2009.

CLASS ACTION COMPLAINT – 38

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525  Fax: 206/223-8224

90.    On February 25, 2011, Syngenta's Head of Industry Relations corresponded with the Head of Syngenta's Southeast Asian Territory as follows:

> I believe I have discussed with you several times about our risk with MIR162 and not having approval in EU and China. I have been getting more questions from traders … lately and [Charles Lee, Head of Corn for North America] wanted me to be sure you understood the potential risk for China.

91.    Syngenta could, and should, have waited to market Viptera. It also could, and should, have withdrawn it from the market before planting. But it did not.

92.    To the contrary, and despite the risks, Syngenta Seeds sold Viptera to approximately 12,000 growers with a projected yield estimated in September 2011 of 250 million bushels. *See Syngenta v. Bunge*, 820 F. Supp. 2d 953, 958 (N.D. Iowa 2011). Viptera was planted in roughly 40 states such that the market for Viptera products was very broad across the U.S. *See id.* at 963. Syngenta projected that Viptera seed sales would exceed twenty percent (20%) of the U.S. corn seed market in future years. *See id.* at 958.

93.    Other published estimates indicate that during the 2011 crop year, Viptera had been planted on 1.1% of the acres in the U.S. on which corn was grown.

E.    **Syngenta's Continuing Irresponsibility After 2011 Planting**

94.    After planting, but before harvest in 2011, the importance of China, and the risk of MIR162 contamination and market disruption, continued to grow.

CLASS ACTION COMPLAINT – 39

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

95.    A 2011 news article projected that China "will probably buy 5 million metric tons this year from 2 million tons in 2010."

96.    On July 22, 2011, Syngenta's CEO Michael Mack stated: "The need to improve yield and quality is present across all emerging markets in the region, although it's China which continues to have the greatest impact on world markets, with increasing imports not just of soybeans but also now of corn." July 22, 2011 Transcript          of          Remarks          (http://www.syngenta.com/global/corporate/SiteCollectionDocuments/pdf/transcripts/H1-2011-results-transcript.pdf).

97.    In fact, Syngenta had known for some time that China would be a significant importer of corn in 2011.

98.    In August 2011, still before the first commercially-grown Viptera corn had been harvested, NGFA and NAEGA issued a Joint Statement warning Syngenta about Viptera:

> U.S. farmers, as well as the commercial grain handling and export industry, depend heavily upon biotechnology providers voluntarily exercising corporate responsibility in the timing of product launch as part of their product stewardship obligation.... The negative consequences of overly aggressive commercialization of biotech-enhanced events by technology providers are numerous, and include exposing exporting companies to financial losses because of cargo rejection, reducing access to some export markets, and diminishing the United States' reputation as a reliable, often-preferred supplier

CLASS ACTION COMPLAINT – 40

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525 Fax: 206/223-8224

of grains, oilseeds and grain products. Premature commercialization can reduce significantly U.S. agriculture's contribution to global food security and economic growth.

Putting the Chinese and other markets at risk with such aggressive commercialization of biotech-enhanced events is not in the best interest of U.S. agriculture or the U.S. economy.

99.    As stated by these associations: "The grain handling and export industry have communicated consistently, clearly and in good faith with biotechnology providers and seed companies about the importance of biotech-enhanced events in commodity crops receiving regulatory approvals or authorizations – prior to commercialization – in key export markets where foreign governments have functioning regulatory systems that approve biotech-enhanced traits. These communications regarding key export markets, identified through market and trade assessments, have been conveyed through industry trade associations and in direct communications by individual companies." *Id.*

100.    Not only did Syngenta commercialize Viptera prematurely, it did so without adequate systems in place to either isolate Viptera or channel it away from markets, including China, from which approval was not obtained.

### F.    Transgenic Contamination

101.    Corn, or maize, has staminate (male) and pistillate (female) flowers on the same plant and is wind pollinated. While there is some possibility of self-fertilization, corn generally is considered an outcrossing species. Under normal field

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

conditions, some 95% of the ovules are fertilized by pollen from other plants. Pollen is released in large quantities. "Individual corn plants produce 4 to 5 million pollen grains. Therefore, even if only a small percentage of the total pollen shed by a field of corn drifts into a neighboring field, there is considerable potential for contamination through cross pollination." Thomison, "Managing 'Pollen Drift' to Minimize Contamination of Non-GMO Corn," Ohio State University Extension Fact Sheet.

102. "Once released from the tassels into the air, pollen grains can travel as far as 1/2 mile (800 m) in 2 minutes in a wind of 15 miles per hour (27 km/h) (Nielsen 2003b)." Kent Brittan, "Methods to Enable the Coexistence of Diverse Corn Production Systems," University of California. Studies indicate that "cross-pollination between cornfields could be limited to 1% or less by a separation distance of 660 feet (200 m), and to 0.5% or less by a separation distance of 984 feet (300 m). However, cross-pollination frequencies could not be reduced to 0.1% consistently, even with isolation distances of 1,640 feet (500 m)." *Id.*

103. The Association of Official Seed Certifying Agencies (AOSCA) recognizes that "[a]lthough most corn pollen is deposited near its origin, isolation by very long distance (several miles) from any other corn is probably the only means of assuring complete confinement other than assuring complete asynchrony of

CLASS ACTION COMPLAINT – 42

flowering." However, "[t]he matter of whom or what entity controls the area constituting a proposed isolation zone and beyond could be crucial and/or problematic to successful confinement." AOSCA Report at 62. Assuring "complete asynchrony of flowering" also is fraught with shortcomings. For example, "[d]ifferences in maturity between the early and late hybrid may not be large enough to ensure that the flowering periods of each hybrid will not overlap, especially when certain climatic conditions may accelerate or delay flowering. Moreover this strategy will only work if [the farmer] control[s] the adjacent fields or can closely coordinate [his] corn planting operations with those of [his] neighbors." Thomison, "Managing 'Pollen Drift' to Minimize Contamination of Non-GMO Corn," OSU Extension Fact Sheet.

104.   In addition, "[p]lanting operations to control pollen drift are only part of the process of producing an IP corn grain crop." *Id.* Other major issues include harvesting, storage, and commingling within the production and supply chain.

105.   "Different corn breeds within an individual farm are commingled at the harvesting stage. Corn from hundreds of thousands of farms is then further commingled as it is gathered, stored and shipped through a system of local, regional and terminal grain elevators. Elevators, storage and transportation facilities are generally not equipped to test and segregate corn varieties. The commingled corn is

CLASS ACTION COMPLAINT – 43

then marketed and traded as a fungible commodity." *In re StarLink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828, 834 (N.D. Ill. 2002).

106.   As a developer of genetic events, including genetically engineered corn, Syngenta knew or certainly should have known the very high likelihood that if commercialized, Viptera would disseminate throughout the supply chain – in fields, storage and transportation – via the numerous routes that transgenic contamination occurs.

107.   Syngenta knew that enough commingling of Viptera with non-Viptera corn would occur at harvest in the fall of 2011 to be detectable in export channels, and that as a result there was a risk that China would reject shipments of corn due to the presence of Viptera, even rejecting corn grown by those farmers who did not plant Viptera, including the Plaintiff and members of the Washington class.

108.   Before commercializing Viptera, Syngenta also knew the risk that Viptera would move into export channels after commercialization, knew that risk was significant, and knew that detection of Viptera in markets lacking approval created significant risk of trade disruption.

109.   Syngenta, however, disclaimed responsibility for assuring that Viptera would not enter the U.S. corn supply through cross-pollination and/or commingling in fields, and for preventing commingling within grain elevators or otherwise within

CLASS ACTION COMPLAINT – 44

the supply chain as described below, virtually assuring that Viptera would broadly contaminate the U.S. corn supply, including contaminating corn grown by those farmers who did not plant Viptera, including the Plaintiff and members of the Washington class.

### G.    Syngenta's Nonsensical and Ineffective "Stewardship" Program

110.    Syngenta's representation in its MIR162 Deregulation Petition that the "ability to channel particular types of maize for particular uses such as the export market" is demonstrated by success in the "specialty maize market" is grossly misleading. In specialty markets like organic farming, the grower receives a premium and, as such, takes the onus on himself to isolate his specialty corn crop from transgenic contamination from neighboring fields (such as spatial and temporal isolation and detasseling). *See* Thomison, "Managing Pollen Drift in Maize Seed Production," Department Horticulture and Crop Science, Ohio State University ("Growers of value added identity preserved (IP) grains need to control pollen contamination in order to optimize expression of value added traits in specialty maize and thereby obtain premiums."). The specialty seller also markets to a specialty buyer to whom he channels. Both have incentive to take all measures necessary to avoid contamination by non-specialty corn. The growing, marketing, and distribution system of commodity corn is vastly different. A "Commodity Crop"

CLASS ACTION COMPLAINT – 45

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

is "a crop which in the ordinary course is grown using common agricultural practices and is commingled and not segregated for special handling or use when it enters the chain of commerce." Biotechnology Industry Organization, "Product Launch Stewardship: Food and Agriculture Section," November 27, 2012, at Annex 1 Introduction n.3.

111.   Syngenta knew that the commodity market is different from the specialty market.

112.   The difficulties with channeling are illustrated by the infamous "StarLink" contamination in 2000 that was the subject of significant litigation. *See In re StarLink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828 (N.D. Ill. 2002). That is particularly so where millions of acres of the commodity to be channeled – MIR162 corn – were planted all across the U.S. Syngenta did not make even minimally reasonable efforts to prevent transgenic contamination.

113.   Syngenta's representations to the USDA illustrate Syngenta's awareness of the kind of system needed to avoid contamination. Well-known measures in specialty markets include specifying strict containment protocols by contract (e.g., cleaning combines and storage areas, isolation distances, dedicated facilities, and inspections) and tracing the product through the supply chain.

CLASS ACTION COMPLAINT – 46

114.    Syngenta, however, did not take meaningful steps to even minimize the risk of pollen-mediated gene flow and commingling of Viptera with non-Viptera corn, like that grown by Plaintiff and members of the Washington class.

115.    Responsible stewardship procedures include, at minimum, "generally accepted best seed quality practices designed to prevent low level presence of unauthorized products and [to] minimize unintended incidental presence of products authorized in the county of production" and "[m]ak[ing] available prior to commercialization a reliable detection method or test for use by growers, processors and buyers that enables crop identity verification for intended use." *See* BIO "Product Launch Stewardship," dated December 10, 2009 Annex 1, Policy Guidance; BIO "Stewardship Actions to be Taken Prior to Launching Special Traits," dated October 4, 2010, Annex 1, Policy Guidance; BIO "Product Launch Stewardship: Food and Agriculture Section," dated November 27, 2010, Annex 1 Policy Guidance.

116.    Syngenta stated that it would make available a reliable detection method or test for MIR162 before commercializing Viptera.

117.    In July 2010, Syngenta executives discussed methods for detecting genetically modified traits.

CLASS ACTION COMPLAINT – 47

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

118.   Syngenta did not provide a test method to farmers or grain handlers as part of a required stewardship program in a timely manner.

119.   Syngenta also could have contractually required that Viptera growers adhere to stringent practices that would have decreased the likelihood of contamination. Syngenta did not do so, however, because to do so would have drastically reduced sales of that product.

120.   Instead, and contrary to requiring isolation, Syngenta Seeds gave away free bags of Viptera to farmers as part of a campaign to encourage growers to grow Viptera side-by-side with other corn to compare performance. *See Syngenta*, 820 F. Supp. 2d at 958.

121.   Syngenta expected Viptera corn to cross-pollinate with non-Viptera corn and told farmers to consider the adjacent corn to be Viptera corn. Yet, there was no contractual requirement for growers to take measures to prevent such cross-pollination in their own fields, to segregate Viptera from non-Viptera corn, or to prevent contamination of other farmers' fields, such as those of the Plaintiff and Washington Class.

122.   In fact, Syngenta advised at least one grower that he had no obligation to tell neighboring corn farmers or grain originators that he had planted Viptera. This

CLASS ACTION COMPLAINT – 48

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

advice was in response to the farmer's concern that he might be liable if his Viptera corn cross-pollinated with his neighbor's corn.

123.   Moreover, on information and belief, in addition to the acreage on which Viptera (and later Duracade) have been grown from sales of those products, Syngenta has grown on land within the U.S. corn containing the MIR162 trait for purposes of seed increase and to develop inventories of product to sell to farmers. This additional growth further increased the presence of MIR162 within U.S. agriculture and the widespread, pervasive contamination that has caused disruption of trade in U.S. corn with China.

124.   Syngenta's commercial sales of Viptera for planting, growing, and harvest in 2011 reached across the U.S., covering nine hundred nineteen (919) counties and thirty-eight (38) states. *See* "Unit Stats by State and County, Viptera Only" (Lee Bunge deposition exhibit); *see also Syngenta v. Bunge*, 820 F. Supp. 2d at 958, 963. Despite the pervasive presence of Viptera and Syngenta's knowledge of the risks, Syngenta did not require growers to comply with the kind of strict measures Syngenta knew were minimally necessary to even have a chance at containment.

125.   Syngenta's professed "channeling" efforts, which could and should have been in place well before harvest to direct Viptera away from markets lacking import approval, also were wholly—and purposefully—inadequate.

CLASS ACTION COMPLAINT – 49

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

126.   In its 2007 MIR162 Deregulation Petition, Syngenta represented that a lack of Chinese approval would not pose a problem for Plaintiff and the Washington class because:

> Syngenta's stewardship agreements with growers will include a term requiring growers to divert this product away from export markets (i.e. channeling) where the grain has not yet received regulatory approval for import. Syngenta will communicate these requirements to growers using a wide-ranging grower education campaign (e.g., grower Stewardship Guide) ... [T]hese procedures are not hypothetical.

127.   Syngenta's "stewardship" program, however, presented "hypothetical" and ineffective procedures, which made contamination of the U.S. corn supply virtually certain.

128.   Contrary to representations in its MIR162 Deregulation Petition, Syngenta did not institute a "wide ranging grower education campaign" through its Stewardship Agreements, Stewardship Guides or otherwise. Syngenta certainly did not do so in a manner that would be meaningful and effective.

129.   None of Syngenta Seeds' Stewardship Agreements with growers contained any details on Syngenta's stewardship program. Instead, the agreement provided that growers should comply with the "most current" version of a "Stewardship Guide," which might or might not be given to them when they received the product, and was subject to unilateral change at any time via modification to a

CLASS ACTION COMPLAINT – 50

website. *See* Syngenta Seeds, Inc. Stewardship Agreement (Revised 08/2009) at 1; Syngenta Seeds, Inc. Stewardship Agreement (Revised 03/14/2011) at 1; Syngenta Seeds, Inc. Stewardship Agreement (Revised 05/11/2011) at 1; Syngenta Seeds, Inc. Stewardship Agreement (Revised 06/05/2013) at 1.

130. In other words, Syngenta's "stewardship" program for Viptera depended, at the outset, on thousands of individual farmers across the country locating and understanding a Stewardship Guide that they may not have been provided at the time of signing the Stewardship Agreement or receiving the product.

131. Moreover, while the Stewardship Agreements contained a provision for "channeling," they made no mention of China.

132. The 2009 version of the Stewardship Agreement provided that the grower "agrees to: Channel grain produced from seed to appropriate markets to prevent movement to markets where the grain has not received regulatory approval for import." It does not, however, identify China as one of those markets. Rather, the agreement states that: "Grain harvested from corn hybrids containing Agrisure Technologies ... may not be fully approved for grain export to **Japan or the European Union**" and that "grain from hybrids that do not have the appropriate import approvals from **Japan and the European Union** must be directed to domestic uses and away from export channels." Syngenta Seeds, Inc. Stewardship

CLASS ACTION COMPLAINT – 51

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

Agreement (Revised 08/2009) at 2 (emphasis added). There is no reference to any other unapproved markets, including China.

133.  The March and May 2011 versions of Syngenta Seeds' Stewardship Agreement said—and did not say—the same thing. *See* Syngenta Seeds, Inc. Stewardship Agreement (Revised 03/14.2011) at 1, 2; Syngenta Seeds, Inc. Stewardship Agreement (Revised 05/11/2011) at 1, 2.

134.  Syngenta Seeds' 2013 version of the Stewardship Agreement removed the reference to Japan and the European Union but even then did not mention China.

135.  None of the agreements contain any instruction on how the grower was supposed to "channel."

136.  Syngenta knew or should have known that bare reference to channeling (and at that, without reference to China) would be ineffective.

137.  "Channeling" by thousands of individual corn farmers under Syngenta's non-existent— or, at minimum, inadequate— "stewardship" program, was certain to fail.

138.  "Channeling" can only work if all grain handlers and others in the supply chain are engaged in that endeavor. For example, BIO recognizes that a realistic assessment of conditions related to handling, distributing, processing, and

CLASS ACTION COMPLAINT – 52

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

testing products must engage the various stakeholders. *See* BIO Product Launch Stewardship, December 10, 2009 at Introduction.

139.    Syngenta did not obtain channeling commitments from supply chain participants, and took no further action to create a marketing plan or channeling mechanism. Syngenta also failed to coordinate with grain handling, export, and other post-harvest firms, to ensure that Viptera corn was not directed to markets for which regulatory approval had not been received, including China.

140.    This failure was purposeful. Syngenta made a decision that no special provisions would be made for grain redirection so as not to decrease sales of Viptera.

141.    Not only did Syngenta decide it would take no measures for channeling Viptera, Syngenta sought to stop exporters and grain elevator operators from attempting to "channel" Viptera away from China. Specifically, Syngenta brought a lawsuit against Bunge, a grain elevator operator, who refused to accept Viptera corn because that operator exported corn to China.

142.    On August 17, 2011, Syngenta issued a letter to Viptera growers expressing disappointment that Bunge and Consolidated Grain & Barge reportedly would "not be accepting grain with the Agrisure Viptera trait." Syngenta recommended to growers that they simply "[d]eliver[] to elevators accepting grain

CLASS ACTION COMPLAINT – 53

with the Agrisure Viptera trait." Syngenta made no mention that these elevators should channel the grain to markets in which that trait had been approved.

143.    Syngenta Seeds sued Bunge, complaining that Bunge could not refuse to accept Viptera corn at its grain elevators. Bunge had posted notices at its grain elevators that it would not accept Viptera corn because the MIR162 trait was not then approved in China, China had a zero tolerance policy regarding non-approved GMO events such as MIR162, and Bunge has significant contracts with Chinese markets that it wanted to fulfill.

144.    Syngenta Seeds sought an injunction requiring Bunge to accept the Viptera corn despite: (i) its earlier representations in the MIR162 Deregulation Petition that corn grown with its MIR162 trait would be channeled away from export markets that had not yet approved of its importation; (ii) the requirement in its Stewardship Agreement with growers who had purchased Viptera seed requiring them to channel their harvested grain away from export markets that had not yet approved the importation of MIR162 corn; and (iii) the protocols referenced above approved by BIO and other organizations, of which Syngenta was/is a member, requiring consultation with industry stakeholders and not commercializing approved traits without major market approval.

CLASS ACTION COMPLAINT – 54

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

145.   At the end of the 2010 crop year in August 2010, China had already become the seventh-largest importer of U.S. corn. *See Syngenta*, 820 F. Supp. 2d at 860-61. Thereafter, in the spring of 2011, Bunge had sold millions of dollars of U.S. corn for delivery to China between September 2011 and January 2012. *Id.*

146.   The Court in *Syngenta v. Bunge* denied Syngenta Seeds' requested injunction on September 26, 2011. In denying the requested injunction, the Court found that it was foreseeable that China would not approve importation of MIR162 during the 2010-2011 crop year, that during that year U.S. exports to China might be significant, and that Syngenta Seeds had caused the very harm of which it complained. The Court refused to shift the risk to Bunge for Syngenta's commercializing of Viptera before receipt of approval from China. Specifically, the Court in that case concluded that:

> [a]t least to some extent, Syngenta's reputational injuries [allegedly caused by Bunge's refusal to accept Agrisure Viptera], though significant, are the result of Syngenta's decision to commercialize Viptera corn before obtaining import approval from significant import markets, including China, where Bunge's rejection of unapproved traits was not wholly unforeseen or unforeseeable.

*Syngenta*, 820 F. Supp. 2d at 988.

147.   The Court also concluded that:

> no reasonable balance of equities would impose upon Bunge the prodigious additional expense of segregating Viptera corn (or

CLASS ACTION COMPLAINT – 55

segregating non-Viptera corn earmarked for Chinese export), where Bunge did not create the situation in Viptera corn has not been yet approved for import to China. That situation arises entirely because Syngenta decided to commercialize Viptera corn knowing that it did not yet have Chinese and some other import approvals and would not have them for the 2011 crop year, and under circumstances in which Syngenta should have reasonably recognized that Chinese imports of United States corn for the 2011 crop year might well be very significant. Syngenta accepted the risk of commercializing Viptera corn, albeit with more than the required or recommended import approvals, but without import approval from all of the reasonably likely foreign markets. I reject Syngenta's request that I shift that risk, instead, to Bunge....

*Id.* at 990.

148.  In addressing the public interest element for injunctive relief, the Court declined to shift the risk of the decision to commercialize MIR162 away from Syngenta: "I find that the public interest strongly favors allocating the risks of a decision to introduce a new transgenic grain into the commercial market on the company that decided to commercialize that grain before obtaining all import approvals." *Id.* at 992.

149.  The Court also found that in the late summer and fall of 2011, exporters other than Bunge, including Cargill and Archer Daniels Midland ("ADM"), had also refused to accept Viptera at some of their facilities due to export market issues such as the failure of Syngenta to receive approval from the European Union. *Id.* at 962.

**H.    Syngenta's Irresponsibility and Misrepresentations Moving into the 2012 Crop Year**

CLASS ACTION COMPLAINT – 56

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525 Fax: 206/223-8224

150.    Despite the risk of contamination and movement of Viptera into export markets, Syngenta continued its course and sold even more Viptera for planting in 2012, further increasing those risks.

151.    Syngenta expanded sales of Viptera even as China was dramatically increasing imports of U.S. corn and was projected to be the largest importer of U.S. corn by the year 2020.

152.    In 2011, Syngenta sold Viptera for the 2012 growing season.

153.    Syngenta was concerned. If grain handlers like Bunge refused to take Viptera, the lack of approval from China might reduce its sales.

154.    On June 29, 2011, Syngenta's Head of Industry Relations warned several Syngenta executives:

> All, just want to continue to let you know the questions about MIR162 continue to increase Both on EU and China. Today at NGFA meeting [a Cargill executive] said his export business is really wound up about China and MIR162 not being approved. I  predict we are going to have some rough water around MIR162 until China and EU are approved.

155.    In early July, 2011, Syngenta's Sarah Hull and others exchanged emails that grain exports were beginning to erect signs announcing their refusal to accept Viptera® from growers because of the threat posed by the lack of approval

CLASS ACTION COMPLAINT – 57

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

from China. Syngenta's management team had been in meetings with representatives from China, and acknowledged the risk.

156.   On July 2, 2011, Syngenta's Head of Industry Relations sent an email to Syngenta management, stating: "[A]s you know I have been warning of this pending potential development for some time . . . China has become a substantial market and we could see this was going to happen."

157.   Syngenta also knew by July 2011 that China would not change its zero-tolerance policy. On July 5, 2011, Syngenta's head of Corporate Affairs China informed the management team: "With regard to the MoA officials . . . they reiterated . . . that at present stage, MoA will not change the GMO safety certificate (for processing) issuing system."

158.   Syngenta, however, chose not to inform Plaintiff and the Washington class, or even Washington growers that purchased Viptera, of the growing danger. Instead, it crafted a plan to mislead Plaintiff, the Washington class, and Viptera growers to believe that Syngenta would have import approval from China by the time Viptera was harvested, despite all indications to the contrary. For instance, one e-mail from Sarah Hull, Head of Global External Affairs, stated that it was "most important" to get grain traders "comfortable that the approval is close," so that they did not tell farmers to avoid MIR162 corn.

CLASS ACTION COMPLAINT – 58

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

159.   The purpose of this plan was to sell more Viptera.

160.   United States Grains Council President, Tom Dorr, in a memorandum dated August 2, 2011 to "Seed Technology Members" and e-mailed to Syngenta, stated that "the current situation regarding the commercialization of unapproved events in China has raised industry-wide concern about potential near and longer-term disruption to US corn exports in China." In the same memorandum, he referred to China as a "major corn importer."

161.   By at least early July 2011, Syngenta was already managing its message and had scripted its responses.

162.   Among other things, Syngenta launched a "blame the grain trade" campaign. Another e-mail from Sarah Hull stated, in pertinent part: "I think we have to find the right balance of making this a 162 problem versus an evolutionary challenge of global grain trade and adjust our actions to reflect the latter."

163.   Syngenta remained focused on its bottom line in commercializing Viptera. For instance, Syngenta internally communicated its "Yields Without Borders Program" and its "Top 10 Tactics to Energize Sales Force and Leverage Grain Marketing Channel to Secure Sales." See Syngenta document entitled: "The Role of Grain Marketing for Future Trait Technologies." Part of this program was

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525  Fax: 206/223-8224

to provide regular (and misleading) updates "on progress and plans for China trait approval and to drive trait acceptance."

164.   To encourage further sales and planting of Viptera, Syngenta, by at least August 2011, was representing to stakeholders, including Plaintiff, the Washington class, and Viptera and Duracade growers, that Syngenta would obtain China's approval by March 2012.

165.   As one of Syngenta's business partners wrote, "[i]f we say March enough, there should be no issue in ordering seed stock and seed companies will have confidence in the March date."

166.   Syngenta, however, did not have a reasonable basis to believe that approval from China would be received in March 2012 and did not itself expect approval by that time.

167.   Indeed, Syngenta's approval submissions to China included insufficient, incorrect, and/or incomplete information, resulting in multiple additional submissions, and also included significant delays by Syngenta in providing standard information. For example, Syngenta did not submit PCR detection methods until January 10, 2011, and had to redeliver the PCR detection method on May 16, 2011, because the first submission was unclear. This information was a required precursor to testing in China, which may take—and is expected to

CLASS ACTION COMPLAINT – 60

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

take—months. On June 22, 2011, Syngenta sent a letter of correction regarding mislabeling of samples. Testing did not begin in China until June 24, 2011. Testing results are known requirements of completed applications. Even after an application is complete, review and deficiency notices requiring correction are not atypical but expected.

168.   No later than July 2011, and likely before that time, Syngenta knew it could not expect approval by March 2012.

169.   Syngenta's own employees recognized that approval would take significantly longer. For instance, a July 1, 2011 e-mail from Syngenta's Brian Walsh indicated that Viptera would not receive approval in China "for a few years yet."

170.   Syngenta received field trial and safety test results in October and November 2011, respectively. Syngenta submitted these results in a now-completed application on November 9, 2011. At that point, Syngenta knew or clearly should have known that it would not have approval by March 2012.

171.   As of May 2012, China's Ministry of Agriculture had reviewed Syngenta's application and had rejected it for deficiencies including all applicable safety analyses. Syngenta submitted another application in June 2012.

CLASS ACTION COMPLAINT – 61

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

172.   In addition, Syngenta sought approval to cultivate MIR162 in, as well as import MIR162 to, China. *See* Reuters "Update 1 – Syngenta confirms it applied to cultivate GMO corn in China" (Oct. 8, 2014) (http://www.reuters.com/article/2014/10/08/china-gmo-syngenta-idUSL3N0S317520141008).

173.   China has more severely restricted the right to cultivate bio-engineered crops than to import them, has not previously allowed any such cultivation by a foreign firm without Chinese participation, and has taken significantly longer to approve cultivation applications than importation applications, all of which may have materially delayed import approval.

174.   Syngenta projected that cultivation approval would not be obtained until 2016.

175.   Syngenta continued to downplay the importance of China and misrepresent the status of China's approval for the purpose of increasing sales of Viptera.  These representations were made to the industry at large, which would include Plaintiff and the Washington class.

176.   Syngenta was far more focused on a potential loss of profits than it was on the risk of trade disruption caused by Viptera. For instance, Syngenta's project lead for Commercial Traits noted a seed shortage, saying it "will work in our favor.

… Hence key business is more the black-eye we now have, vs. actual impact on sales."

177.    Syngenta e-mails reveal that executives were plotting strategies to try to get China to expedite its review, including strategies to try to convince U.S. government officials to tell China that failing to approve MIR162 would "put US corn trade at serious risk."

178.    As Syngenta continued to make its misrepresentations and the presence of Viptera continued to spread, so did the risk of contamination of the U.S. corn supply with MIR162 – and the risk of market disruption. And Syngenta knew it. On July 11, 2011, Syngenta's Head of Global External Affairs, Sarah Hull, emailed other Syngenta executives regarding a plan devised with Syngenta's Michael Mack, to convince China to speed up its approval. Mr. Mack "want[ed] the Chinese to know that every ship carrying corn into China this fall will have 162 in it at some level." Ms. Hull asked for information to verify numbers supporting that message:

> I need to pull some numbers together to make this a fact-based argument and wondered who could help me.
>
> We know that US plantings of [MIR]162 = 540,000 bags, representing 1.6% of the total corn market. I assume this is consistent with your citing ¼ billion bushels of Viptera grain is in fields today, but will you verify these facts?

179.    Ms. Hull acknowledged that (contrary to earlier representations to the USDA that MIR162 could be effectively channeled like specialty maize), the ability

CLASS ACTION COMPLAINT – 63

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

to channel in a "closed loop" system is much different than a commodity crop. She noted: "I know we need to be careful not to undermine our position that we can successfully grow products in closed loop systems such as Enogen [corn developed by Syngenta for ethanol production], but I think we have to do what we can to get China to speed up this review.

180.   The plan was for Syngenta to compare prior Syngenta contamination incidents (MIR604 and Bt10 corn) with the presence of MIR162 in the U.S. corn supply in order to show with dispersion modes "that under 0 tolerance even very little in the system had extensive hits." This, Ms. Hull said, should convince U.S. Government officials to convey to Chinese officials the need to approve MIR162 "or put US corn trade at serious risk."

## I.   Syngenta's Continued Deception Regarding China's Approval of MIR162

181.   Syngenta continued its deception within the industry regarding the status of approval from China throughout 2012.

182.   Despite knowing that its incomplete and delayed regulatory filings with China assured that Syngenta would not obtain import approval for Viptera by March 2012, Syngenta nevertheless instructed employees in January 2012 to tell grain handlers that Syngenta would obtain approval from China by March of 2012.

CLASS ACTION COMPLAINT – 64

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

183.    After the first quarter passed without approval from China, Syngenta told employees to "**verbally**" communicate that Syngenta "continue[s] to anticipate that this approval will be received shortly." (Emphasis in original).

184.    On or about April 10, 2012, Sarah Hull emailed Rex Martin, Syngenta's representative to the U.S. Grains Council, stating: "We need to get some indication to growers or [NCGA] that China Viptera approval is done and is only waiting for the administrative signatures . . . David [Morgan] and Chuck [Lee] said growers are starting to return seed and we need to try to stop this."

185.    During Syngenta's first quarter 2012 earnings conference call on April 18, 2012, Syngenta's Chief Executive Officer, Michael Mack, publicly stated that he expected China to approve Viptera "quite frankly within the matter of a couple of days." http://www.morningstar.com/earnings/37715637-syngenta-ag-adrsyt-q1-2012-earnings-call-transcript.aspx. This, of course, was a year after Syngenta had already sold large quantities of Viptera to farmers across the country.

186.    Syngenta did not as of April 2012 have a reasonable basis to believe China's approval was "done," or for its representation that approval was imminent. Syngenta certainly did not have any sort of official approval.

187.    Indeed, Syngenta received a rejection and deficiency letter from China's Ministry of Agriculture on May 15, 2012.

CLASS ACTION COMPLAINT – 65

188.    Syngenta also distributed misleading written materials indicating that Viptera **could** be exported to China.

189.    For example, Syngenta distributed a "Request Form for Bio-Safety Certificates Issued by the Chinese Ministry of Agriculture" for Viptera. In China, "Bio-Safety Authorizations" are required for the issuance of shipment-specific "Bio-Safety Certificates." However, applying for shipment-specific Bio-Safety Certificates was, and is, pointless because MIR162 had not been approved for importation in China.

190.    Syngenta knew that its Request for Bio-Safety Certificates Forms was pointless but distributed it in an effort to mislead growers, including Plaintiff and the Washington class.

191.    Syngenta also distributed a "Plant with Confidence Fact Sheet," which contains deceptive statements regarding the importance of China as an export market.     http://www.syngenta-us.com/viptera_exports/images/Agrisure-Viptera-Fact-Sheet.pdf.

192.    For example, the "Plant with Confidence Fact Sheet" states:

> The vast majority of corn produced in the U.S. is used domestically. There is a misconception that China imports more grain than it actually does from the U.S. China has imported, on average, a little more than half of one percent – 0.5% – of all U.S. corn produced in the past five years....

CLASS ACTION COMPLAINT – 66

Since very few U.S. grain outlets actually export to China, most have no reason to restrict your right to plant the latest technologies.

http://www.syngenta-us.com/viptera_exports/images/Agrisure-Viptera-Fact-Sheet.pdf (emphasis removed).

193.    Contrary to the Plant with Confidence Fact Sheet, the NGFA reported:

The U.S. Department of Agriculture (USDA) forecasts that China will become the world's largest corn importer by 2020. China is projected to increase its corn imports to 22 million metric tons (866 million bushels) by 2023, up from 2.7 million metric tons (106 million bushels) in 2012. For 2013, USDA had projected that the United States would export 37 million metric tons (1.457 million bushels) of corn, and that China would import an estimated 7 million metric tons (276 million bushels) – virtually all of it from the United States.

http://www.ngfa.org/wp-content/uploads/NGFA-Flyer-for-Farmer-Customers-on-Potential-Market-Impacts-of-Commercializing-Biotech-Enhanced-Seeds-Not-Approved-for-Import-into- U.S.-Export-Markets.pdf.

194.    In other words, for 2013, the USDA estimated that China represented nearly 20% of the U.S. export market.

195.    Before China's discovery of MIR162 in U.S. corn shipments, China was the third-largest market for U.S. corn, and its share of our market was projected to grow substantially. China is by far the largest potential growth market for U.S. corn.

CLASS ACTION COMPLAINT – 67

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

**J.      Syngenta Expanded Sales of Viptera Acreage Despite Having No Approval from China, Even While the Importance of the Chinese Market Continued to Increase.**

196.    China continued to be a major and growing market for U.S. corn and corn products during the 2012 and 2013 crop years.

197.    However, during that period, China still had not yet approved the import of MIR162. Syngenta was still in the approval process and was correcting deficiencies identified by the Chinese Ministry of Agriculture. It had no assurance that approval would be conferred by the 2013 crop year. In fact, as of October 2013, Syngenta was still completing required research for its application.

198.    Corn industry groups continued to object to Syngenta Seeds' commercialization of Viptera.

199.    In fact, during 2012-2013, China had become the third largest export market for U.S. corn. As reported by Iowa Corn Growers Association, "[i]n 2012/13, China was the third largest export market for U.S. corn and up until the recent issue [the rejections beginning in 2013] [China] was on track to meet or exceed that position." China and MIR162, 2-2014, Iowa Corn Growers Association (Feb. 6, 2014).

200.    Nevertheless, Syngenta continued to market Viptera during the 2012 and 2013 crop years. Estimates were that during this period Syngenta had increased

CLASS ACTION COMPLAINT – 68

the market share of Viptera to well more than 2%, and, by some estimates as high as 3.5%, of the corn area grown in the U.S.

201.    This increase further ensured that Viptera would disseminate throughout the U.S. corn supply and that it could not— and would not—be channeled away from export markets, such as China, which had not approved MIR162, thereby jeopardizing the entire U.S. corn market, including corn grown by Plaintiff and the Washington class.

### K.    China's Rejection of U.S. Corn

202.    In November 2013, China rejected shipments of U.S. corn that tested positive for the presence of MIR162.

203.    On December 24, 2013, the General Administration of Quality Supervision, Inspection, and Quarantine of China issued a warning notification strengthening the inspection and supervision for the import of GMO feed materials. The December 24 notification indicated that all batches of corn would now be tested at the Chinese ports for MIR162, and that any cargo that tested positive for MIR162 would be returned or destroyed.

204.    Before this notification, statements from the seller/exporter that the products had tested negative for MIR162 were sufficient. The December 24

CLASS ACTION COMPLAINT – 69

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

notification thus substantially altered the conditions for export of U.S. corn into China.

205.   It was not possible to ensure a "zero" level of MIR162 in the Chinese testing (i.e., a negative test of a container in the U.S. could still result in a positive test in China).

206.   The uncertainty associated with the likelihood that every shipment would test positive for MIR162 if tested in China caused Chinese customers to walk away from their contracts for U.S. corn and added a great deal of uncertainty to the market. Not surprisingly, prices for corn and distillers dried grains with solubles ("DDGS") fell.

207.   In December 2014, China finally approved MIR162 for importation into China. By then, however, Syngenta had already begun commercializing another unapproved bio-engineered corn trait. U.S. corn exports to China have not yet begun to recover, and this approval is not likely to lessen the impact of Syngenta's conduct and the resulting embargo in the near future, if ever.

**L.    Regulation, Testing, and Deregulation of Event 5307**

208.   Despite China's rejection of U.S. corn because of the presence of MIR162, Syngenta nonetheless pressed on with commercialization of yet another GMO corn seed product.

CLASS ACTION COMPLAINT – 70

209.    On April 22, 2011, just months after Syngenta Seeds released Viptera for the 2011 crop year, Syngenta Biotech filed with APHIS a petition seeking the deregulation of another insect resistant, genetically-modified trait known as Event 5307. Event 5307 was ultimately deregulated by APHIS on January 29, 2013.

210.    Between 2005 and 2011, Syngenta Biotech conducted at least 101 field trials of Event 5307 corn under at least 22 notifications made to APHIS under the GMO Regulations at sites in 23 states.

211.    At least some of the field trials of Event 5307 included tests of corn stacked with multiple traits, including both Event 5307 and MIR162. Further, on information and belief, field tests conducted under the GMO Regulations of Event 5307, either singly or together with other traits (including MIR162), continued during the period after the filing of the Event 5307 Deregulation Petition and the January 29, 2013 decision to deregulate Event 5307.

212.    In its deregulation petition for Event 5307, Syngenta Biotech disclosed that upon deregulation of Event 5307, Syngenta Seeds did not intend to market Event 5307 as a stand-alone product, but intended to combine it with other traits, including MIR162. It also stated that it intended to seek approval of products containing Event 5307 in countries that had functioning regulatory systems and that "Syngenta is also pursuing regulatory approvals for importation of corn commodities and processed

CLASS ACTION COMPLAINT – 71

goods containing 5307 corn in key export markets for U.S. and Canadian corn" and that applications were currently planned for a number of additional countries, including China. In the discussion of "Adverse Consequences of Introduction," Syngenta Biotech stated that an upcoming Environmental Report would discuss a range of issues related to the deregulation of Event 5307 corn, "including any potential direct, indirect or cumulative impacts on ... the economy, either within or outside the U.S." Petition for Determination of Nonregulated Status for Rootworm-Resistant     Event     5307     Corn,     at     156     (Apr.     22,     2011) (http://www.aphis.usda.gov/biotechnology/petitions_table_pending.shtml).

213.   Following approval of Event 5307, Syngenta Seeds announced that it would commercialize Duracade for the 2014 crop year, containing both Event 5307 and MIR162, despite the continued failure to obtain approval from China for MIR162 and the fact that Event 5307 also had not been approved.

## M.   Commercialization of Duracade Despite MIR162's Continued Disruption of the U.S. Corn Trade

214.   In November 2013, China rejected shipments of U.S. corn that tested positive for MIR162. Syngenta has, nevertheless, continued its false statements and misrepresentations, as alleged herein, including through its decision to market Duracade in the 2014 crop year.

CLASS ACTION COMPLAINT – 72

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

215.    The NGFA has detailed the disastrous results of China's rejection of U.S. corn based on the presence of MIR162:

> This development resulted in a series of trade disruptions – including testing; delays in vessel discharge; and deferrals, diversion and rejections of cargoes – when MIR162 subsequently was detected in U.S. shipments of corn and distillers dried grains with solubles (DDGS). These disruptions effectively shut U.S. corn farmers out of China's feed grain import market, which previously almost exclusively had been supplied by the United States. China subsequently has taken actions to utilize domestic, as well as international alternatives to U.S. corn. For instance, China's imports of U.S. grain sorghum have increased significantly. China also has sourced corn from Ukraine. And most recently, Brazil and Argentina each were granted approval to begin exporting corn to China....

> This disruption, tied to positive detections of MIR162 that began in November 2013, has virtually halted U.S. corn trade with China.

> . . .

> USDA currently is projecting Chinese corn imports will reach 22 mmt [million metric tons] by 2023, which if realized would account for nearly half of the projected growth in total world corn trade. However, if the MIR162-related trade disruption continues, other corn exporting nations, such as Ukraine, are capable of replacing the United States as the principal corn exporter to China....

> [T]he MIR162-induced trade disruption has resulted in market price loss on unfulfilled export sales, price loss on diverted sales because of the compromised economic negotiating position of U.S. exporters, demurrage costs, and lower market prices for U.S. commodities and products. The total loss for these sectors of the U.S. grain industry is estimated to range from $1 billion to $2.9 billion.

CLASS ACTION COMPLAINT – 73

http://ngfa.org/wp-content/uploads/Agrisure-Viptera-MIR-162-Case-Study-An-Economic-Impact-Analysis.pdf.

216.   Syngenta nevertheless moved forward with commercialization of Duracade for the 2014 planting season.

217.   On January 23, 2014, the NGFA and the NAEGA issued another Joint Statement imploring Syngenta to stop its heedless and irresponsible commercialization:

> On Jan. 22, 2014, the National Grain and Feed Association (NGFA) and North American Export Grain Association (NAEGA) sent a letter to Syngenta asking the company to immediately halt commercialization in the United States of its Agrisure Viptera corn and Agrisure Duracade corn until such time as China and certain other U.S. export markets have granted required regulatory approvals/authorizations.
>
> The NGFA and NAEGA ... are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural producers – as well as the United States' reputation to meet its customers' needs – that has resulted from Syngenta's current approach to stewardship of Viptera. Further, the same concerns now transcend to Syngenta's intended product launch plans for Duracade, which risk repeating and extending the damage. Immediate action is required by Syngenta to halt such damage.
>
> There are numerous negative consequences incurred when the Chinese and other U.S. export markets are put at risk through commercialization of biotechnology-enhanced seeds before approvals for import into foreign markets are obtained. Such consequences may include reducing the value and demand for the U.S. farmers' products, preventing foreign consumer access to much-needed supplies, shutting off or increasing the cost of

CLASS ACTION COMPLAINT – 74

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525 Fax: 206/223-8224

U.S. producers' access to some export markets for their crops, exposing exporting companies to financial losses because of cargo rejections and contract cancellations, and ultimately diminishing the United States' reputation as a reliable, often-preferred supplier of grains, oilseeds and grain products in world markets. Commercialization prior to foreign regulatory approvals also has a negative impact on the overall U.S. corn and other grain value chains, and reduces significantly U.S. agriculture's contribution to global food security and economic growth.

Within the U.S. grain and oilseed handling and marketing system, each purchaser or handler makes its own determination as to whether to accept various commodity crops – including those produced from biotechnology-enhanced seeds. Such a decision likely is driven by customer preferences, infrastructure and operational limitations, regulatory regimes and contractual commitments, as well as meeting regulatory requirements in the respective markets they serve. Given the nature of the U.S. grain marketing system, these business decisions extend to the first point of sale or transfer from the producer.

As a matter of policy, NGFA and NAEGA have communicated consistently, clearly and in good faith with biotechnology providers and seed companies about the importance of biotechnology providers actually obtaining regulatory approvals/authorizations for import in foreign markets before such traits are commercialized in the United States. Individual grain handler, processor, service provider and exporter member companies of our Associations represent further system-wide support and advocacy for this policy.

U.S. farmers, as well as the commercial grain handling and export industry, depend heavily upon the exercise of due corporate responsibility by biotechnology providers with respect to the timing of product launch and commercialization. We therefore seek assurances from Syngenta that it will follow suit by publicly announcing that it will suspend immediately its commercialization of Viptera and Duracade products in the

CLASS ACTION COMPLAINT – 75

United States until such time as China and other U.S. export markets have granted required regulatory approvals and authorizations.

http://www.ngfa.org/wp-content/uploads/NAEGA-NGFA-Joint-Public-Statement-on-Syngenta- Agrisure-Viptera-and-Duracade-Biotech-Traits-Jan-23-2014.pdf.

218.   Syngenta spokesman, Paul Minehart, responded by stating: "Changing our marketing plan in the U.S. now **would have no effect on grain in the system** or Chinese acceptance of corn imports." Reuters, "U.S. Groups urge Syngenta to hold back on GM corn barred by China" (Jan. 23, 2014) (emphasis added).

219.   This pronouncement recognizes that MIR162 has indeed contaminated the U.S. corn supply, including corn grown by non-Viptera or Duracade users, to an extent that it cannot be undone. This is particularly true given that Syngenta continues to market and sell Duracade in addition to Viptera.

220.   In March 2014, in meetings with the NGFA, Syngenta advised that its introductory launch of Duracade would likely extend to 250,000 to 300,000 acres in a launch zone that included portions of each of the ten states that grow the largest amounts of corn. In the same meetings, Syngenta refused to accept responsibility or liability if and when Duracade becomes present in countries that had not approved it. NGFA, Latest News, "Syngenta Provides Additional Details on Plans for 'Introductory launch' of Duracade, Biotech Corn in 2014" (March 7, 2014)

CLASS ACTION COMPLAINT – 76

(http://www.ngfa.org/2014/2014/03/07/Syngenta-provides-additional-details-on-plans-for-introductory-launch-of-duracade-biotech-corn-in-2014/).

221.   In launching Duracade, Syngenta stated that growers would be required to sign a stewardship agreement requiring the grower to either feed the corn to livestock or poultry on the farm, or deliver it to a grain handling facility, feed mill, feed lot, or ethanol plant not exporting corn or corn co-products to China or the European Union. *See* National Grain and Feed Association Newsletter Vol. 66, No. 5 at 2 (dated March 7, 2014).

222.   The version of the stewardship agreement at launch, and referencing Duracade, did not do so. *See* Syngenta Seeds Inc. Stewardship Agreement (Rev. 6/05/2013). This version is, even now, the agreement Syngenta posts on its website. *See*                                                                 http://www3.syngenta.com/ country/us/en/agriculture/Stewardship/Documents/SyngentaStewardshipAgreemen t.pdf.

223.   Syngenta also did not require planting or harvesting protocols, but only made "recommendations" that the grower: (1) select fields for planting Duracade surrounded by the grower's own corn fields or planted next to a non-corn field; (2) place signs to notify others that Duracade was planted in the field; (3) plant buffer rows; (4) clean planters; (5) properly dispose of unused seed and return unopened

CLASS ACTION COMPLAINT – 77

seed units to the seed provider; (6) separately harvest Duracade; (7) flush the combine; (8) deliver corn containing Duracade to a previously arranged delivery point; (9) store Duracade in a separate bin on the grower's farm; and (10) clean the bin floor.

224.   Syngenta officials stated that while Syngenta would apprise growers of such "recommendations," it "declined to incorporate the recommendations into the stewardship agreement because they did not want to dictate such practices to producers." National Grain and Feed Association Newsletter Vol. 66, No. 5 at 2 (March 7, 2014).

225.   Syngenta was and is well aware that such measures are minimally necessary to an adequate stewardship program. Yet, Syngenta did not require such measures in connection with either Viptera or Duracade.

226.   The NGFA issued a dire forecast of the damage Duracade's premature commercialization would cause:

> For the 2014 planting season, Syngenta has introduced another trait called Agrisure Duracade 5307 (hereafter referred to as 5307) that currently lacks Chinese import approval, potentially prolonging the U.S. loss of the large, growing Chinese feed grain import market....
>
> China is roughly one year into its semi-regular, two-year process of evaluating the authorization of 5307 for import in food, feed and for further processing. Since Chinese authorization of 5307 is not expected for at least another year, China is expected to

CLASS ACTION COMPLAINT – 78

continue enforcing a zero-tolerance policy for unapproved biotech-enhanced traits in 2014/15, as occurred in marketing year 2013/14 for MIR162. Thus, the commercialization in the United States of 5307 is expected to prolong the economic impact on U.S. corn and other commodities that began in mid-November 2013.

Similarly to 2013/14, when the United States lost access to the Chinese corn import market, the 2014/15 market price impact caused by the presence of 5307 in U.S. commodity exports is expected to extend beyond the corn market and potentially affect other commodities, such as DDGS, soybean meal and soybeans, because of the substitutability of corn for these commodities in domestic feed rations....

[A]fter accounting for projected benefits and costs, the net economic impact of the 5307 commercial launch is estimated to result in a loss to the U.S. grain value chain ranging from $1.2 billion to $3.4 billion, with a mid-point estimated net economic loss of $2.3 billion.

http://www.ngfa.org/wp-content/uploads/Agrisure-Duracade-5307-Economic-Impact Analysis.pdf.

227.   In March 2014, Syngenta pulled Duracade from the Canadian market for the 2014 growing season because China and the European Union had not yet approved MIR162.

228.   Syngenta said in a notice to Canadian growers: "While the vast majority of the Canadian corn crop is typically directed to domestic markets in North America, some corn may be destined for these markets." Reuters, "Syngenta halts sales of new GMO corn seed in Canada" (Mar. 10, 2014). "Accordingly, we want to

CLASS ACTION COMPLAINT – 79

ensure the acceptance of any trait technology grown in Canada meets end-market destination requirements." *Id.*

229.    As illustrated by the statements of its own representatives and this action, Syngenta knew that China was and is a key corn importer and that responsible management requires that its approval be obtained before commercialization of a bio-engineered corn trait.

230.    As further illustrated, Syngenta knows how to withdraw an unapproved GMO trait from the market when it wants to do so.

231.    Nevertheless, Syngenta continued to market and sell MIR162 corn in the U.S.

232.    Compounding its irresponsibility, Syngenta then decided to commercialize Duracade in 2014, even though it contains MIR162 Event 5307.

233.    In September 2014, Syngenta announced 52 new corn hybrids for the 2015 growing season. MIR162 was in 23 new Viptera products and 18 new Duracade products. See "Syngenta Announces 52 New Corn Hybrids for 2015 Season" (Sept. 17, 2014) (http://www.agprofessional.com/news/Syngenta-announces-52-new-corn-hybrids-for-2015-season-275494841.html).

234.    In December 2014, China finally approved MIR162 for importation into China. By then, however, Syngenta already had begun commercializing yet

CLASS ACTION COMPLAINT – 80

another GMO corn seed product as discussed above. In addition, China's December 2014 approval is not likely to lessen the impact of Syngenta's conduct anytime soon.

235.    Syngenta affirmatively and purposefully engaged in all the actions and inactions described above to increase its own profits, ignoring the tremendous risks its profit-driven strategy imposed on growers, including Plaintiff and the Washington class.

236.    Syngenta knew, or should have known, before its commercialization of Viptera and at all times since then of the high likelihood that Viptera would contaminate the U.S. corn supply and that channeling in the circumstance of its clearly inadequate "stewardship" program would not work. It was inevitable that Viptera corn would move into export channels, including China, and cause trade disruption, as Syngenta well knew.

237.    Syngenta's acts and omissions have resulted in, and will continue to result in, the pervasive contamination of the U.S. corn supply, including fields, grain elevators and other facilities of storage and transport, causing physical harm to Plaintiff's and the Washington class's  corn, equipment, storage facilities, and land.

238.    The likelihood that Viptera—and Duracade—would (and will continue to) contaminate the U.S. corn supply was readily foreseeable to, and indeed foreseen

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

by, Syngenta, as was the harm to Plaintiff and the Washington class, whom Syngenta describes as among its stakeholders "affected by" Syngenta's business.

239.   Syngenta had the right and ability to control the timing, size, and geographic scope of its commercialization of Viptera and Duracade, as well as the extent to which adequate containment measures would be required of its customers. Syngenta also could have instituted channeling measures but did not. Syngenta also ignored repeated warnings from stakeholders and misrepresented and concealed material information, all to further its own profit.

240.   Syngenta did not simply fail to take precautions against foreseen and foreseeable harm, to Plaintiff and the Washington class but Syngenta acted affirmatively to create such harm.

241.   Syngenta's conduct has directly caused and contributed to cause significant economic harm to Plaintiff and the Washington class, as explained below.

## N.    Economic Impact

242.   The characteristics of the global corn market have important implications for understanding the market price impact of the Chinese MIR162 ban on U.S. corn. Those include:

a.  Corn is the most widely used feed grain in the world.

b.  The U.S. is by far the largest producer and exporter of corn.

CLASS ACTION COMPLAINT – 82

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

c.  Before the import ban, virtually all of China's corn imports were from the U.S.

d.  Before the import ban, China was the third largest market for U.S. corn exports.

e.  The latest USDA agricultural trade projections placed China as becoming the world's largest importer of corn by 2020.

f.  The import ban virtually halted U.S. corn sales to China indefinitely.

g.  The world price of corn is established in Chicago, and the loss of a key market for the U.S. put downward pressure on the world price that reverberated to farmgate prices throughout the U.S.

h.  Corn is a commodity and a relatively small change in the global volume of trade in a commodity market like corn will have a magnified price impact.

i.  An exporter's reputational loss in an agricultural commodity market due to an event like a GMO contamination can persist for many years. Once an exporter has lost a foreign market, it is difficult to get it back.

## O.    Global Corn Market

243.   World corn production totaled 983.3 million metric tons (mmt) in 2013/14 (about 38.7 billion bushels). This supply was concentrated in a relatively small number of countries. The world's largest corn producers are the U.S. with about 36% of global production in 2013/14; China (about 22% of production); Brazil (8%), and the EU (7%).

CLASS ACTION COMPLAINT – 83

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

244.   Global usage of corn has expanded by about 37% in the last decade, due to rising population and incomes, and increased urbanization with its associated changing dietary patterns. Feed usage accounts for about 58% of total global corn use, industrial use 27%, and food 11%. The pie chart below shows corn consumption by region.

**World Corn Consumption By Region**



Source: International Grains Council

245.   At the end of each crop year, corn inventories are carried forward in case of a short harvest. The U.S. and China are the largest holders of corn inventories. At the end of 2013/14, these two countries held 70% of the 176 mmt of global stocks.

CLASS ACTION COMPLAINT – 84

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

246.   Total world corn trade is about 100 to 120 mmt per year. Before the MIR162 ban, China was importing about 4% of global corn sales. That amount was projected by the USDA to increase substantially by 2020, when the USDA projected that China would be the world's largest importer of corn at 16 million metric tons.



**China expected to become largest global corn importer**

Source: USDA Production, Supply and Distribution database and projections.

247.   The U.S. is the dominant exporter of corn. The big exporters include the U.S. (36% of world trade), Brazil (20% of exports), the Ukraine (17%), and Argentina (10%). These four countries alone account for over 82% of global exports.

///

///

///

CLASS ACTION COMPLAINT – 85

### Table: Major Corn Exporters: July 2013/ June 2014

| Exporting Country | U.S. | Brazil | Ukraine | Argentina | Others | Total |
|---|---|---|---|---|---|---|
| Exports (million metric tons) | 42.8 | 23.5 | 19.9 | 12.0 | 21.8 | 120.0 |
| Exports (million bushels) | 1,685 | 925 | 783 | 472 | 858 | 4,724 |

Source: International Grains Council

248.    Just over 10 years ago, China was a significant exporter of corn (as well as all grains) with exports peaking at 15.2 million metric tons in 2002/03. China flipped from being a net corn exporter to a net corn importer in 2009/2010.



249.    As the chart below shows, China turned from a net exporter to a net importer of grains in 2008. Imports of grains (including corn) surged during the 2012-13 time period, reaching 18 mmt. Most of this grain originated from the U.S.

CLASS ACTION COMPLAINT – 86



Note: Net imports = imports − exports. Data for calendar years.
*DDGS= Distillers Dried Grains With Solubles.
Source: USDA, Economic Research Service analysis of China customs statistics.

250.   The import side of the international trade equation is more diverse, with the major importers including the EU, Japan, Mexico, South Korea, Chinese Taipei, China, and Turkey (together accounting for 55% of imports in 2013/14). This leaves 45% of the corn imports destined for a large number of small importers.

### Major Corn Importers



Source: International Grains Council.

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

251.  In its annual long-term grain trade projections, released in February 2014, the USDA projected that China's corn imports would grow from 2.7 mmt in 2012/13 to 22 mmt in 2023/24. China is by far the largest potential growth market for U.S. corn. These projections place China as the largest corn importer in the world by 2020.

## P.    U.S. Corn Market

252.  Corn is the largest crop in the U.S. by both value of production and planted acres. In the 2013/14 September-August fiscal year, U.S. growers produced about 13.9 billion bushels of corn, worth more than $60 billion. Corn is used for livestock feed (37% of 2013/14 crop), food, alcohol and industrial usage (46% of the 2013/14 crop), and exports (14% of the 2013/14 crop). USDA, Economic Research Service, Feedgrains Yearbook, Table 4. (http://www.ers.usda.gov/data-products/feed-grains-database.aspx#.VEJk-SiwRzo).

253.  The U.S. corn marketing system is predominantly commodity-based. Corn grown by farmers is harvested, gathered, commingled, consolidated, and otherwise shipped from thousands of farms to local, regional, and/or terminal distribution centers. From there, it is often transported by exporters to foreign countries.

CLASS ACTION COMPLAINT – 88

254.   Grain elevators are facilities at which grains are received, stored, and then distributed for direct use, process manufacturing, or export. They can be generally referred to as either "country," "subterminal," or "terminal" elevators.

255.   "Country elevators" are a linchpin of the U.S. commodity grain handling and marketing system. Country elevators are smaller elevators that receive grain by truck directly from local farms during the harvest season. In addition to providing grain storage and drying services to farmers, country elevators buy individual loads of grain from local farmers for cash. A country elevator then will sell the grain it has purchased and stored in volume to subterminal or terminal grain elevators for further movement in the commodity corn supply chain.

256.   Corn prices throughout the U.S. are tied to the Chicago Board of Trade Futures (CBOT) price through the "basis" (defined as the futures price minus the local cash price). The U.S. corn market is spatially integrated and informationally efficient. Basis levels for spatially separated markets are also closely linked. Events like trade disruptions that affect the CBOT corn prices directly affect the price that U.S. corn farmers receive for their corn.

257.   Grain elevators test and grade corn for weight, moisture content, and foreign materials. Grain elevators are not equipped to test and segregate corn for

CLASS ACTION COMPLAINT – 89

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

genetic traits due to the costs associated with such a time-consuming process. Many grain elevators are not equipped to test for the MIR162 trait in corn.

258.    The terminal grain elevator receives grain via rail or truck. Terminal grain elevators have the capacity to hold larger quantities of corn, with some holding several million bushels of grain. After receiving the grain, terminal operators sell large shipments to manufacturers or continue to store the grain for later sale to domestic and foreign buyers.

259.    Some corn is sold for manufacture into corn ethanol. Ethanol manufacture results in a corn by-product known as DDGS. DDGS from the ethanol industry is commonly sold as a high protein livestock feed. In the U.S., DDGS is packed and traded as a commodity product.

260.    Corn and processed grain from terminal elevators are transported by truck, rail, and/or ship to their final destination. Exporters may load the products themselves, or may contract with others for hauling and/or loading/transfer services. Corn bound for China is typically loaded into shipping containers and shipped by rail either to the West Coast or New Orleans, where the containers are loaded onto ships. Large exporters may deal in entire vessels loaded with corn, while smaller exporters ship containers of these products on container ships that may carry containers of other products, or from other exporters, as well.

CLASS ACTION COMPLAINT – 90

261.    Once the corn or DDGS arrives in China, it must be cleared for import before the counter-party who has purchased the product may take delivery.

262.    Thus, the commodity supply chain for corn bound for China may involve country elevators, sub-terminal elevators, terminal elevators, truckers and other haulers, loaders and transport companies, and exporters who ship the product to China.

263.    Elevators both own and store corn for sale further down the supply chain.

264.    Similarly, exporters may purchase and sell corn and DDGS, or may expect these products under a variety of consignment agreements. They have incurred injury due to the loss of the Chinese export market under either arrangement.

## Q.    China's Corn Market

265.    China has emerged as a large player in the global market for agricultural products. As of 2012, it was the fourth largest exporter and second largest importer of agricultural products in the world according to World Trade Organization trade statistics. Its import growth has been driven by a shift in its domestic production mix and changing consumer diets with rising incomes and urbanization. The changing

CLASS ACTION COMPLAINT – 91

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

diets have especially driven strong demand growth for meat (mainly pork and chicken), which requires a large supply of feed grains including corn and soybeans.

266.   China is now the largest foreign market for U.S. agricultural products. The USDA reports that U.S. agricultural exports to China have almost doubled in the last five years, totaling $28 billion in fiscal October 2013-September 2014. USDA, Outlook for U.S. Agricultural Trade, AES-83 (Aug. 28, 2014).

267.   Before China banned the import of U.S. corn, the top three U.S. agricultural exports to China (in order of importance) were soybeans, cotton, and corn, based on value of trade. In November 2013, China turned back cargoes containing Syngenta's MIR162 corn. While MIR162 is now approved, Event 5307 is not.

268.   U.S. corn exports to China reached 5.146 mmt in 2011/12 (approximately 13% of U.S. exports that September-August marketing year) and were 2.39 mmt in 2012/13–still about 13% of exports (lower export volume due to the big U.S. drought). By contrast, due to China's import ban of U.S. corn, the absolute volume of U.S. corn exports to China in 2013/14 was not much higher than the drought year and fell to less than 6% of exports.

269.   If the current trend that began in 2013 continues, U.S. corn exports to China in the future will be negligible.

CLASS ACTION COMPLAINT – 92

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

270.   The following graph shows the dramatic difference in accumulated U.S. exports to China after the MIR162 ban, taking into account seasonal variations in export quantities:



5/15/2015 Source: USDA/FAS/Export Sales Reporting

271.   If the China market continues to deny access to U.S. corn imports, the losses will be even more significant. As the following quote explains, China was expected to be a very rapidly growing import market for corn:

> China's corn imports are projected to rise steadily and reach 22 million tons by 2023/24. China's strengthening domestic demand for corn is driven by structural change and growth in its livestock sectors, as well as by rising industrial use. The increase in China's imports accounts for nearly half of the projected growth in world corn trade. USDA Long-Term Projections at p.20 (February 2014).

USDA Agricultural Projections to 2023,

www.usda.gov/oce/commodity/projections/.

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

272.   For fiscal year 2013/2014 China was expected to import 7 mmt of corn and 6 mmt in 2014/15. Since the news of the rejected cargoes surfaced, USDA analysts have lowered projections of China's total annual imports from 7 to 3.5 mmt in 2013/14 and from 6 to 3 mmt for 2014/15. These projections obviously reflect the assumption that U.S. corn trade with China will begin again sometime in 2014/15. The damage to the U.S. corn market and the prices U.S. corn Plaintiff and the Washington class receive for their corn likely will be long lasting.

273.   China replaced imports from the U.S. with has increased imports from the Ukraine; and reportedly small shipments from Brazil and Argentina. In other words, the U.S. is already beginning to lose China as an important corn export market, and it will be difficult to get it back.

**R.    GMOs in China**

274.   China imports more biotech soybeans than any other country. The vast majority of China's soybean imports are biotech varieties, even though biotech soybeans (and corn) are not commercially grown in China. China imports soybeans primarily from the U.S., Brazil, and Argentina.

275.   China has approved five-biotech crops for importation – canola, cotton, corn, soybeans, and sugar beets. Approximately 15 different corn biotech products have been approved by China, including "events" developed by Monsanto,

CLASS ACTION COMPLAINT – 94

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

Syngenta, Bayer, and DuPont. The number of approved soybean products is approximately eight and there are six cotton and seven canola products. Only one sugar beet product has been approved.

276.   China tested and rejected cargoes of U.S. corn in November 2013.

277.   By mid-December 2013, China had rejected shipments of U.S. corn totaling 545,000 metric tons. *See* http://www.reuters.com/article/2013/12/20/china-corn- idUSL3N0JZ0EZ20131220.

278.   Beginning in July 2014, China's General Administration of Quality Supervision, Inspection, and Quarantine announced that it would require official government certification from the point of origin that shipments of DDGS are free of MIR162. China's rejection of U.S. DDGS due to the presence of MIR162 hurt the price of U.S. corn.

**S.     DDGS Trade**

279.   U.S. DDGS exports to China totaled 2.16 mmt in calendar year 2012 and 4.45 mmt in calendar year 2013. DDGS trade has been hit hard recently but the extent of the impact on corn prices may not show up in the trade data yet.

**U.S. Exports of Corn and DDGS to China: 2009-2013 (calendar years)**

CLASS ACTION COMPLAINT – 95

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224



Source: USDA, GATS. DDG HS code 2303300000

280.   China was by far the largest market for U.S. DDGS exports accounting for approximately 50% of all exports. The U.S. exports over 20% of annual DDGS production.

http://www.extension.iastate.edu/agdm/crops/outlook/dgsbalancesheet.pdf.

281.   The loss of the large Chinese market for DDGS displaces corn in the U.S. domestic market, pushing corn prices down further.

282.   The impact of the loss of the Chinese market for corn and corn products to U.S. corn growers, including Plaintiff and the Washington class, will be long lasting. The MIR162 incident has similarities to other international GMO contamination incidents, which have had long-lasting market effects. For instance, more than eight years after the 2006 Bayer Crop Science's Liberty Link contamination of the U.S. long-grain rice supply, exports to Europe have yet to

CLASS ACTION COMPLAINT – 96

recover. Before the 2006 marketing year, the EU-27 procured approximately 25% of its rice imports from the U.S. Immediately after the contamination event, the EU blocked imports of any new commercial U.S. long-grain rice imports. In fact, U.S. long grain rice farmers lost one of their most important markets, and they have yet to get it back despite considerable effort and expense. Recently, an official delegation from the U.S. rice industry visited countries in the EU (such as Germany and the United Kingdom) where they held discussions focused on the re-introduction of U.S. rice into this important market. After this visit, the USA Rice Federation reported that market re-entry faces significant hurdles:

> The U.S. has a superior product and the industry has successfully addressed environmental and social concerns of this market, but it's clear we have more work to do before our German customers return to us," said Keith Glover, president and CEO of Producers Rice Mill and chairman of USA Rice's World Market Price committee. USA Rice Federation, *USA Rice Daily* (Oct. 14, 2014).

283.    In commodity markets like corn, a relatively small change in trade volume can have a significant impact on price. One of the prime examples of the operation of this basic law of economics occurred in 1973, when Middle Eastern oil producers (Iran and Arab members of OPEC) cut off exports to the U.S. to protest American military support for Israel. Even though imports from this region accounted for only about 10% of the U.S. oil supply, petroleum prices quadrupled

CLASS ACTION COMPLAINT – 97

in response to the export embargo and there were long lines for gasoline at filling stations.

284.    Another more recent example of inelastic demand at work is evident from the world coffee market. Brazil produces about 35% of the world's coffee and is unfortunately in the middle of a drought that is affecting both the 2014 and 2015 coffee harvests in that country. In 2014, the Brazilian coffee harvest was down about 13% and this doubled the price of coffee. World coffee production is about 150 million bags per year, and as the following quote from the *Financial Times* indicates, a 10 million bag swing in Brazil's production over a two-year period (about a 3.5% change in production) can mean the difference in coffee prices ranging between $3 and $1.50 per pound:

> Brazil is the largest coffee producer in the world, accounting for about 35 per cent of all output. Industry consensus around the 2014 Brazilian harvest seems to have settled at about 48m 60kg bags, down from the previous year's 54-55m, but the 2015 forecasts have ranged widely between 40m and 53m bags. Estimates for the cumulative Brazil supply 2014 and 2015 combined, range from 92m to 102m bags, which is the difference between $3.00 and $1.50 per pound of coffee. *Financial Times* (Sept. 17, 2014).

285.    Based on the same economic logic, the *Wall Street Journal* reasoned that the loss of the Chinese corn market to the U.S. industry over MIR162 will have an important impact on the U.S. corn price, even though that market represented

CLASS ACTION COMPLAINT – 98

only about 12% of U.S. exports: "Exports account for only about 12% of the U.S. corn crop, but China's rapid growth gives the country an outsize influence over prices." *Wall Street Journal*, U.S. Corn Exports to China Dry Up Over GMO Concerns (Apr. 11, 2014).

286.   In the U.S. corn market, both domestic demand and supply curves are relatively inelastic, especially in the short run. Elasticity measures the degree of responsiveness in supply or demand to price changes. If both the supply and demand curves are inelastic, then for each curve it will take a relatively large change in price to effect a change in quantity demanded or supplied. This is shown in the left panel of the diagram below, where the U.S. domestic demand for corn is represented as schedule $US_D$ and the domestic supply is labeled as $US_S$. Both of these curves are inelastic as drawn. The horizontal difference between the supply ($US_S$) and demand ($US_D$) at world price ($P_{US}$) is the amount of corn exported.

287.   The right hand panel of the diagram shows the market for U.S. corn exports. The U.S. export supply curve shown to the world market is labeled as $US_{ES}$. This curve is based on the U.S. domestic supply and demand curves in the left hand panel. For any price above the point where $US_D$ and $US_S$ intersect in the left-hand panel, there is excess domestic corn that is supplied to the world market according to the schedule $US_{ES}$ in the right hand panel. The world demand for U.S. corn is

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

shown by the curve ROW$_{ED}$ in the right hand panel. This includes demand from China. Following the MIR162 ban the ROW$_{ED}$ curve shifts left as shown by the arrows in the right hand panel. An inward shift of the global demand for U.S. corn reduces exports from the U.S. The intersection of the shrunken ROW$_{ED}$ curve and US$_S$ determines the volume of trade after the MIR162 ban. U.S. corn exports are reduced by a fixed volume due to a foreign market closing, and the U.S. price falls to P'$_{US}$. The drop in price is relatively large, even if the shrinkage in exports is a small share of production, because the price must fall to clear a market in which supply and demand are inelastic.



288. Under the bedrock economic law of supply and demand, for an exportable good, when there is less foreign demand for a product, particularly one with relatively inelastic demand and supply curves, the price is lower than it otherwise would be.

CLASS ACTION COMPLAINT – 100

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525 Fax: 206/223-8224

289.   As a result, all U.S. corn growers, including Plaintiff and members of the Washington class, have received a lower price for their corn than they would have received if China's imports of U.S. corn had not effectively stopped.

290.   These effects will continue in the future, both because Chinese purchasers may not necessarily return to former U.S. suppliers even though MIR162 is now approved, and also because the presence of Event 5307 in Syngenta's Duracade corn may cause contamination similar to the contamination caused by MIR162 alone.

## IV.   CLASS ACTION ALLEGATIONS

291.   **Washington class.** Plaintiff, Chep R. Gauntt, brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class consisting of:

> All residents of Washington that produced and sold corn in Washington, on a commercial basis (or who received revenue from or such corn under a crop-share agreement), from the 2011 growing season until at least the present.

Excluded from the Class are the Court and its employees; Syngenta; any parent, subsidiary, or affiliate of Syngenta; and all employees and directors who are or have been employed by Syngenta during the relevant time period.  Also excluded from the Class are any corn producers that knowingly planted corn containing the MIR162

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

event.  Plaintiff reserves the right to amend the Class definition prior to class certification.

292.  Plaintiff seeks to represent the Class for any damages and other relief. Plaintiff asserts claims against Syngenta individually and on behalf of all Class members for the violations of law alleged herein.

293.  All requisite elements of Federal Rules of Civil Procedure 23 are satisfied, making class certification appropriate.

294.  **Numerosity.**  The numerosity requirement of Federal Rule of Civil Procedure 23(a)(1) is satisfied for the proposed Class, because the members of the proposed Class are so numerous and geographically dispersed that joinder of all their members is impracticable.  Although the exact number and identity of each member of the Class is not known, there are believed to be many of non-Viptera, non-Duracade corn growers in Washington

295.  **Commonality.**  The commonality requirement of Federal Rule of Civil Procedure 23(a)(2) is satisfied because there are questions of law or fact common to Plaintiff and the other members of the Class.  Among those common questions of law and fact are as follows:

> a.  whether the members of the Washington class have sustained
>     damages in their business or property by reason of Syngenta's

CLASS ACTION COMPLAINT – 102

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

violation of Washington law, and, if so, the proper measure and appropriate formula to be applied in determining damages;

b.  whether Syngenta, through its acts or omissions, caused or contributed to cause the loss of export markets for U.S. and Washington corn and DDGS, including China;

c.  whether Syngenta knew or should have known that their acts or omissions would cause or contribute to cause the loss of export markets for U.S. and Washington corn and DDGS, including China;

d.  whether Syngenta is legally responsible for the loss of U.S. corn and DDGS export markets and the reduction in price received for U.S. corn and DDGS, as well as lost business and increased costs associated with the loss of the Chinese export market under one or more of the legal theories asserted in this Complaint;

e.  whether Plaintiffs and the members of the proposed Class are entitled to compensatory, consequential, and exemplary damages;

f.  whether Syngenta had a duty to exercise reasonable care in its commercialization of MIR162 and/or Event 5307 corn;

g.  whether Syngenta breached its duty of care in its commercialization of MIR162 and/or Event 5307 corn; and

CLASS ACTION COMPLAINT – 103

h. whether Syngenta was negligent in breaching its duty of care in its commercialization of MIR162 and/or Event 5307 corn.

296. **Typicality.** The typicality requirement of Federal Rule of Civil Procedure 23(a)(3) is satisfied because Plaintiff's claims arise from the same course of conduct by Syngenta and are based on the same legal theories as the claims of the Class. Plaintiff and the other Class members each sustained damages arising from Defendants' wrongful conduct, as alleged more fully herein. All Class members have been the subject of Defendants' unfair and unlawful business practices as described herein. The relief sought is common, unitary, and class-wide in nature. The same material facts that Defendants withheld from Plaintiff were withheld from the other Class members. Further, Plaintiff seeks the same forms of relief as other Class members. More specifically, Plaintiff Chep R. Gauntt's claims are typical of the claims of members of the Class. Therefore, the "typicality" requirement of Federal Rule of Civil Procedure 23(a)(3) is satisfied.

297. **Adequacy.** The adequacy requirement of Federal Rule of Civil Procedure 23(a)(4) is satisfied because Plaintiff is committed to the vigorous prosecution of this action, which is reflected in Plaintiff's retention of competent counsel experienced in complex litigation. Because Plaintiff Chep R. Gauntt's claims are typical of the claims of members of the Class, Plaintiff has every incentive

CLASS ACTION COMPLAINT – 104

to vigorously pursue those claims and adequately protect interest of the Class he seeks to represent.  Plaintiff has no conflicts with, or interests antagonistic to, the other members of the Class they seek to represent who have been damaged as a result of the conduct alleged herein.

298.  **Class Counsel.** Plaintiff's counsel satisfies the requirements of Federal Rule of Civil Procedure 23(g) to serve as Class counsel.  Plaintiff's counsel has identified and thoroughly investigated the claims set forth herein, and are highly experienced in complex litigation in general.  Plaintiff's counsel has extensive knowledge of the applicable law and possesses the resources to commit to the vigorous prosecution of this action on behalf of Plaintiff and the other members of the Class.

299.  This action also meets the requirements of Federal Rule of Civil Procedure 23(b)(2) because Syngenta has acted, or refused to act, on grounds generally applicable to Plaintiff and other members of the Class, making final declaratory relief with respect to the proposed Class appropriate.

300.  **Predominance.**  Moreover, this action meets the requirements of Federal Rule of Civil Procedure 23(b)(3).  Common questions of law and fact, including those set forth above, exist as to all Class members' claims.  These common questions predominate over questions affecting only individual Class

CLASS ACTION COMPLAINT – 105

members.  A class action is superior – if not the only method – for the fair and efficient adjudication of this controversy.

301.   The proposed Class has a well-defined community of interest in the questions of fact and law to be litigated. The common questions of law and fact are predominate with respect to the liability issues, relief issues and anticipated affirmative defenses. The named Plaintiff has claims typical of the members of the Class they seek to represent.  Without limitation, as a result of Defendants' conduct alleged herein, Plaintiff and members of the Class were: (a) injured; and, (b) sustained pecuniary loss in an ascertainable amount to be proven at the time of trial.

302.   Class treatment will permit large numbers of corn growers, similarly situated, to prosecute their respective claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. The certification of a Class in this action is superior to the litigation of a multitude of cases by members of the putative class. Class adjudication will conserve judicial resources and will avoid the possibility of inconsistent rulings. Moreover, there are members of the Class who are unlikely to join or bring an action due to, among other reasons, their reluctance to sue Defendants and/or their inability to afford a separate action. Equity dictates that all persons who stand to benefit from the relief sought herein should be subject

CLASS ACTION COMPLAINT – 106

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

to the lawsuit and hence subject to an order spreading the costs of the litigation among the members of the Class in relationship to the benefits received. Even if the members of the class themselves could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

303.   This action is manageable as a class action.  Notice may be provided to members of the Class by First Class U.S. Mail and through alternative means, including publication.  Furthermore, the claims set forth below based on Washington law will apply evenly to all proposed members of the Class (as noted below).  Thus, the superiority and manageability requirements Federal Rule of Civil Procedure 23(b)(3) are satisfied.

## V.    CAUSES OF ACTION

## COUNT I. VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT

CLASS ACTION COMPLAINT – 107

304.    Plaintiff repeats, realleges, and incorporates herein by reference as though fully set forth herein all preceding paragraphs of this Complaint.

305.    Plaintiff brings this cause of action individually and on behalf of the Class.

306.    Syngenta violated the Washington Consumer Protection Act.

307.    Syngenta engaged in unfair or deceptive acts or practices including, but not limited to, the following:

a. Prematurely commercializing Viptera and Duracade on a widespread basis without reasonable or adequate safeguards;

b. Instituting a careless and ineffective "stewardship" program;

c. Failing to enforce or effectively monitor its "stewardship" program;

d. Selling Viptera and Duracade to thousands of corn farmers with knowledge that they lacked the mechanisms, experience, ability and/or competence to effectively isolate or "channel" those products;

e. Failing to adequately warn and instruct farmers on the dangers of contamination by MIR162 and at least the substantial risk that planting Viptera would lead to loss of the Chinese market;

CLASS ACTION COMPLAINT – 108

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

f.  Distributing misleading information about the importance of the Chinese market; and

g.  Distributing misleading information regarding the timing of China's approval of Viptera and/or Duracade.

308.  Syngenta's unfair and deceptive acts or practices described above were committed in the course of Syngenta's trade or commerce.

309.  Syngenta's unfair and deceptive acts or practices described above affected public interest.

310.  Syngenta's violation of the Washington CPA, whether individually or in combination, caused Plaintiff's and the Washington class's injuries and damages as set forth herein.

## COUNT II. NEGLIGENT MISREPRESENTATION

311.  Plaintiff repeats, realleges, and incorporates herein by reference as though fully set forth herein all preceding paragraphs of this Complaint.

312.  Plaintiff brings this claim individually and on behalf of the Class.

313.  Syngenta made negligent misrepresentations when commercializing Viptera and Duracade, including, but not limited to, the below.

314.  Syngenta, along with Plaintiff and the Washington class, are part of an interconnected industry and market that demands and expects all market participants

CLASS ACTION COMPLAINT – 109

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

to act, at least in part, for the mutual benefit of all others in their interconnected web.

315.   Syngenta has pledged to stakeholders, including Plaintiff and the Washington class, that they will act responsibly in introducing new genetically modified traits. Syngenta failed to act responsibly when commercializing Viptera and Duracade.

316.   Plaintiff and the Washington class grow non-Viptera or Duracade corn, but that corn was, or had the potential to be, contaminated with Viptera or Duracade corn through cross-pollination of fields as well as through commingling during shipping or at grain elevators after harvest.

317.   The contamination and commingling of non-Viptera or Duracade corn with Viptera or Duracade corn caused major trade disruption and massive harm to Plaintiff and the Washington class.

318.   Syngenta's commercialization of Viptera and Duracade directly impacts Plaintiff and the Washington class, even though they did not choose to plant Viptera or Duracade.

319.   Syngenta owed a duty to Plaintiff and the Washington class, as well as all other members of the interconnected market, to use at least reasonable care in the timing, scope, and terms under which it commercialized Viptera and Duracade.

CLASS ACTION COMPLAINT – 110

320.   Syngenta owed this duty specifically to the Plaintiff and members of the Washington class who, although they did not grow Syngenta products, are members of the larger interconnected market.

321.   Syngenta used and/or continues to use in commerce false or misleading descriptions of fact, and/or false or misleading representations of fact, which were likely to cause and/or did cause confusion and mistake.

322.   Syngenta's representations, statements, and commentary have been largely disseminated, and included statements:

a. To APHIS and the public, including stakeholders interested in the MIR162 Deregulation Petition, that deregulation of MIR162 should not cause an adverse impact on export markets for U.S. corn, that Syngenta would communicate the stewardship requirements "using a wide ranging grower education program," and that at the time the MIR162 Deregulation Petition was submitted to APHIS, regulatory filings were in progress in China;

b. To APHIS and the public, that MIR162 could and would be channeled away from markets that had not yet approved MIR162;

c. To the press and to investment analysts on quarterly conference calls;

d. Directly to Stakeholders and the general public through statements in marketing materials published on the Internet such as its "Plant With Confidence" fact sheet; and

e. Indicating that approval from China for MIR162 corn was expected at times when Syngenta knew it was not.

CLASS ACTION COMPLAINT – 111

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

323. In addition, Syngenta stated in 2007 that its regulatory filings with China were "in process" when it did not actually file for approval from China until 2010.

324. Syngenta made numerous misrepresentations pertaining to the status of China's import approval for MIR162. Among others, and as more fully set forth above, Syngenta during the summer of 2011, represented to stakeholders, including Plaintiff and the Washington class (to encourage further sales, planting, and harvesting of MIR162), that it would receive China's approval in March 2012. Syngenta continued making this misrepresentation throughout the planting and harvesting season in 2011 and into 2012. On April 18, 2012, Syngenta's Chief Executive Officer, Michael Mack, stated that he expected China to approve Viptera "quite frankly within the matter of a couple of days." Based on Syngenta's knowledge of the Chinese regulatory process, and its own status within that process for MIR162, Syngenta knew this representation was false and/or made this representation recklessly and willfully without regard to its consequences.

325. In addition to these false and misleading statements, Syngenta failed to disclose, and actively suppressed and concealed, that approval from China was not reasonably likely to occur (at least) for the 2011 and 2012 growing seasons and that

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

purchase and planting of Viptera created at least a substantial risk of loss of the Chinese market.

326.   Syngenta also has at all times made false and misleading statements regarding the ability to channel MIR162 corn, as well as the state and effectiveness of its supposed stewardship generally and in regard to MIR162.

327.   Syngenta also failed to disclose, and actively suppressed and concealed, that there was not (and would not be) an effective system in place for isolation or channeling of Viptera or Duracade.

328.   As a developer of genetically modified products (including MIR162), Syngenta has special knowledge of regulatory matters and facts pertaining to the content and status of its application for foreign approvals to which Plaintiff and the Washington class, do not have access.

329.   Syngenta also has special knowledge regarding the systems it did and did not institute for isolation and channeling of its genetically modified products, including Viptera and Duracade, which was not available to Plaintiff and the Washington class.

330.   Syngenta knew but failed to disclose, suppressed, and concealed that systems were not in place to isolate or effectively channel Viptera and Duracade, and that absent robust isolation practices and effective channeling, it was virtually certain

CLASS ACTION COMPLAINT – 113

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

that Viptera or Duracade would disseminate throughout the U.S. corn supply and into export markets, including China, which had not approved import, causing market disruption.

331.   Syngenta also knew but failed to disclose, suppressed, and concealed, at minimum, in 2010-2011 that it would not have import approval from China by the 2011 crop year and in 2011-2012 that it would not have import approval from China by the 2012 crop year, and failed to disclose that China was a significant and growing import market. Syngenta further failed to disclose at all relevant times the insufficiency of its approval request to China, and that it sought approval to cultivate MIR162 in China, both of which Syngenta knew would cause delay in China's approval process for MIR162. Syngenta also failed to disclose, and suppressed and concealed, that there was not (and would not be) an effective system in place for isolation or channeling of Viptera or Duracade and the very high likelihood that MIR162 would move into export channels where it was not approved, causing market disruption.

332.   Syngenta continues to make misrepresentations to Plaintiff and the Washington Class- specifically that China was not a key export market at the time Viptera was commercialized and thus channeling was and still is not required.

CLASS ACTION COMPLAINT – 114

333.    Syngenta engaged in these deceptions to sell and increase its sales of Viptera and Duracade, despite Syngenta's further knowledge that the more acres grown with them, the more likely it would be that Viptera and Duracade would disseminate into the U.S. corn supply and Plaintiff and the Washington class would be harmed.

334.    Syngenta knew that Plaintiff and the Washington class are affected by Syngenta's business and depend on Syngenta to engage in responsible commercialization practices.

335.    For all these reasons, Syngenta had a duty to disclose the truth – that import approval from China (a key market) was not imminent or indeed anticipated for (at least) the 2011 and 2012 growing seasons, that there was not an effective system in place to channel Viptera and Duracade away from China (or other foreign markets) from which it did not have approval, and that commercializing Viptera (and later Duracade) without Chinese import approval or an effective channeling system created a substantial risk of loss of the Chinese market and/or prolonging the loss of that market.

336.    In addition, Syngenta made numerous misrepresentations to the effect that approval from China was on track and/or would be received during time periods when Syngenta knew it was not, and that Viptera and Duracade could, and would,

CLASS ACTION COMPLAINT – 115

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

be channeled away from markets for which approval had not been obtained. Syngenta had a duty to prevent its representations from misleading others in the interconnected market, including Plaintiff and the Washington class.

337.   Syngenta's misrepresentations and omissions were made intentionally or recklessly.

338.   Syngenta, in connection with the sale of merchandise – Viptera and Duracade – knowingly misrepresented, directly or indirectly, the true quality of that merchandise.

339.   Syngenta's misrepresentations caused actual damage to the business and property of Plaintiff and the Washington class as a result of the contamination and commingling of non-Viptera or Duracade corn with Viptera or Duracade corn.

340.   Syngenta's misrepresentations and omissions proximately caused harm to Plaintiff and the Washington class, entitling Plaintiff and the Washington class to compensatory damages and prejudgment and post-judgment interest.

341.   Syngenta made the foregoing representations without having reasonable grounds for believing them to be true. The representations made by Syngenta were false as set forth above.

342.   The foregoing representations were made directly by Syngenta, sales representatives, and other authorized agents of Syngenta, in publications and other

CLASS ACTION COMPLAINT – 116

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

written materials that were directed to corn farmers and the general public, with the intention of inducing reliance on the misrepresentations, thereby promoting the sale and use of its products containing the MIR162 trait.

343.    Plaintiff Chep R. Gauntt and the class did, in fact, reasonably rely upon the representations.

344.    As a result of Syngenta's actions, omissions, and misrepresentations, Plaintiff and the Washington Class suffered substantial economic damages.

## COUNT III.  FRAUD

345.    Plaintiff repeats, realleges, and incorporates herein by reference as though fully set forth herein all preceding paragraphs of this Complaint.

346.    Plaintiff brings this claim individually and on behalf of the Class.

347.    Syngenta blatantly and intentionally distributed false information, including, but not limited to, assuring Washington corn farmers that Viptera and Duracade would be bought by China.

348.    Syngenta had a duty to disseminate truthful information to the general public, including the Plaintiff and the Washington Class, and a parallel duty not to deceive the general public and the Plaintiff and the Washington Class.

CLASS ACTION COMPLAINT – 117

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

349.    The information distributed by Syngenta to Plaintiff and the Washington Class and the general public contained false representations that Syngenta knew was not true.

350.    Syngenta's representations were all false and misleading.

351.    Upon information and belief, Syngenta intentionally suppressed, ignored, and disregarded facts not favorable to Syngenta.

352.    Syngenta's representations were made with the intent that Plaintiff and the Washington Class and the general public would rely upon them.

353.    Syngenta's representations were made with the intent of defrauding and deceiving the Plaintiff and the Washington class, other consumers, and the general public and encourage the sale of Viptera and Duracade.

354.    At the time the representations were made, Plaintiff and the Washington Class and the general public and other consumers did not know the truth with regard to Viptera and Duracade.

355.    Plaintiff and the Washington class did not discover the true facts with respect to Viptetra and Duracade nor Syngenta's false representations regarding the same, nor could Plaintiff and the Washington class have discovered the true facts.

CLASS ACTION COMPLAINT – 118

356.   Plaintiff and the Washington class and the general public and other consumers did in fact rely upon the representations. In the absence of Syngenta's representations.

357.   Syngenta's conduct was fraudulent and deceitful, and was committed willfully, wantonly, and/or purposely to induce the purchase of Viptera and Duracade.

358.   As a result of the foregoing acts and omissions, Plaintiff and the Washington class suffered injuries and economic damages.

## COUNT III.  VIOLATION OF THE WASHINGTON PRODUCT LIABILITY ACT

359.   Plaintiff repeats, realleges, and incorporates herein by reference as though fully set forth herein all preceding paragraphs of this Complaint.

360.   Plaintiff brings this cause of action individually and on behalf of the Washington class.

361.   At all times relevant to this action, Syngenta was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Viptera and Duracade corn.

362.   At all times relevant to this action, Viptera and Duracade corn was expected to reach, and did reach, consumers in the State of Washington and

CLASS ACTION COMPLAINT – 119

throughout the United States, without substantial change in the condition it was sold.

363.   In violation of the Washington Products Liability Act, RCW 7.72, et. seq., at the time the Viptera and/or Duracade corn left control of Syngenta, Syngenta did not provide adequate warnings.

364.   Syngenta has in the past and continues to manufacture, sell, or otherwise distribute corn containing MIR162.

365.   Syngenta sold Viptera and Duracade into the stream of commerce by selling it to farmers.

366.   Viptera and Duracade were used as intended.

367.   Viptera and Duracade were used in a manner Syngenta could reasonably anticipate.

368.   Syngenta, along with Plaintiff and the Washington class, are part of an interconnected industry and market that demands and expects all market participants to act, at least in part, for the mutual benefit of all others in their interconnected web.

369.   Syngenta has pledged to stakeholders, including Plaintiff and the Washington class, that they will act responsibly in introducing new genetically modified traits. Syngenta failed to act responsibly when commercializing Viptera and Duracade.

CLASS ACTION COMPLAINT – 120

370.    Plaintiff and the Washington class grow non-Viptera or Duracade corn, but that corn was, or had the potential to be, contaminated with Viptera or Duracade corn through cross-pollination of fields as well as through commingling during shipping or at grain elevators after harvest.

371.    The contamination and commingling of non-Viptera or Duracade corn with Viptera or Duracade corn caused major trade disruption and massive harm to Plaintiff and the Washington class.

372.    Syngenta's commercialization of Viptera and Duracade directly impacts Plaintiff and the Washington class, even though they did not choose to plant Viptera.

373.    Syngenta owed a duty to Plaintiff and the Washington class, as well as all other members of the interconnected market, to use at least reasonable care in the timing, scope, and terms under which it commercialized Viptera and Duracade.

374.    Syngenta owed this duty specifically to the Plaintiff and members of the Washington class who, although they did not grow Syngenta products, are members of the larger interconnected market.

375.    Syngenta knew, or had reason to know, of the dangers associated with corn containing the MIR162 event, including the potential physical harm to non-Viptera or Duracade corn and the property of Plaintiff and the Washington class.

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

376.    Syngenta knew that Plaintiff and the Washington class would be at foreseeable risk by the use of Viptera and Duracade in the interconnected market.

377.    Syngenta failed to exercise reasonable care to inform Viptera and Duracade growers of the potential for Viptera and Duracade corn to contaminate non- Viptera and Duracade corn grown by Plaintiff and the Washington class.

378.    Syngenta, as a member of the interconnected market, had a duty to warn and/or instruct Plaintiff and the other members of the Washington class about the potential dangers of Syngenta's decision to commercialize Viptera and Duracade, as well as to warn Washington growers that did grow Viptera and Duracade corn of the potential dangers of commercialization of that product.

379.    Syngenta did not give adequate warning of the danger of Viptera and Duracade to Viptera and Duracade growers, to Plaintiff, or to the Washington class. Nor did Syngenta give adequate instructions to Washington class members as to how to protect themselves from the use of Viptera and Duracade by other Washington farmers. At the time Viptera and Duracade left Syngenta's control, it possessed characteristics that may cause damage, and Syngenta failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product and the Plaintiff and Washington class, who are part of the

CLASS ACTION COMPLAINT – 122

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525 Fax: 206/223-8224

interconnected market. The warning was inadequate and Syngenta could have provided adequate warnings or instructions.

380.  Further, adequate warnings or manufacturer instructions were not provided after Viptera and Duracade were manufactured and when Syngenta learned of, or should have learned of, the dangers of marketing and selling the products prior to international approval.

381.  Plaintiff and the other members of the Washington class suffered injury and damages as a direct and proximate result of Syngenta's failure to provide an adequate warning and/or instructions to those in the interconnected market, including Plaintiff and the Washington class, regarding the dangers of Viptera and Duracade.

382.  Thus, Syngenta knew, or should have known, that its conduct would result in injuries to Plaintiff and the other members of the Washington class.

383.  Nevertheless, Syngenta continued such conduct in reckless disregard of or conscious indifference to those consequences.

384.  As a direct and proximate result of the foregoing, Plaintiff and the other members of the Class have been injured and suffered financial loss for which damages, declaratory and other relief as may be available at law or equity is warranted.

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

385.   Syngenta is strictly liable to Plaintiff and the other members of the Washington class as a result of its failure to warn about the dangers of Viptera and Duracade.

**COUNT V. PUNITIVE DAMAGES UNDER MINN. STAT. §549.20**

386.   Plaintiff repeats, realleges, and incorporates herein by reference as though fully set forth herein all preceding paragraphs of this Complaint.

387.   Plaintiff brings this cause of action individually and on behalf of the Washington class.

388.   Under Washington choice of law principles, a court may permit a jury to award punitive damages under another state's law. *Singh v. Edwards Lifesciences Corp.*, 151 Wn. App. 137, 210 P.3d 337 (2009). Syngenta is a citizen of Minnesota.

389.   The Minnesota Statute §549.20 permits claims for punitive damages, providing in pertinent part:

> (a) Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.
>
> (b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
>
> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
>
> (2) deliberately proceeds to act with indifference to the high

CLASS ACTION COMPLAINT – 124

probability of injury to the rights or safety of others.

390. Syngenta's acts, as alleged above, meet the standard under Minn. Stat. §549.20, entitling Plaintiff and the Washington class to punitive damages. Because Syngenta's acts meet the Minn. Stat. for punitive damages, Minnesota is interested in punishing and deterring such conduct. Therefore, Syngenta is liable for punitive damages under Minnesota law.

## VI.    REQUEST FOR RELIEF

Plaintiff, on behalf of himself and the Washington class, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A.    That the Court certify the Washington class pursuant to the Federal Rule of Civil Procedure 23 and designate Plaintiff as representative of the Washington class and the undersigned Class Counsel as counsel to the Washington class;

B.    All monetary and compensatory relief to which they are entitled and will be entitled at the time of trial;

C.    That the Court enter a judgment finding:

i.    Syngenta's release of corn containing the MIR162 event, including Viptera and Duracade, was negligent

CLASS ACTION COMPLAINT – 125

ii.   Syngenta failed to adequately warn or instruct corn growers, including Plaintiff and the Washington class as to the danger of corn containing the MIR162 event, including Viptera and Duracade.

D.   That the Court award monetary damages, including compensatory relief, to which Plaintiff and the Class members are entitled to, in an amount to be determined at trial;

E.   That the Court award punitive damages to Plaintiff and Class members, in an amount to be determined at trial;

F.   That the Court award Plaintiff his costs incurred in this action and reasonable attorney's fees;

G.   That the Court award Plaintiff prejudgment interest;

H.   That the Court award such other and further relief as may be available at law or equity as the court deems just and proper.

## VII.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues.

///

///

///

///

CLASS ACTION COMPLAINT – 126

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

1   Dated:  October 16, 2017              LAW OFFICES OF JAMES S. ROGERS

2

3                                         s/ James S. Rogers
                                          _____
4                                         James S. Rogers, WSBA # 5335
                                          Attorneys for Plaintiff
5                                         1500 Fourth Avenue, Suite 500
                                          Seattle, WA 98101
6                                         Phone: (206) 621-8525
                                          Facsimile: (206) 223-8224
7                                         Email: jsr@jsrogerslaw.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

CLASS ACTION COMPLAINT – 127